# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CASA de MARYLAND, INC. | ) | |
| 8151 15th Avenue | ) | |
| Hyattsville, MD 20528 | ) | |
| Prince George's County | ) | |
| | ) | |
| JOSE E. GUEVARA | ) | |
| JUAN RODRIGUEZ, | ) | |
| and LUIS ANDRADE[1] | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 8:18-cv-00845 |
| | ) | |
| DONALD J. TRUMP, in his official capacity as | ) | |
| President of the United States | ) | |
| 1600 Pennsylvania Avenue, N.W. | ) | |
| Washington, DC 20500 | ) | |
| | ) | |
| KIRSTJEN M. NIELSEN, in her official capacity as | ) | |
| Secretary of Homeland Security | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) | |
| 3801 Nebraska Avenue, N.W. | ) | |
| Washington, D.C. 20016, | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) | |
| 3801 Nebraska Avenue, N.W. | ) | |
| Washington, D.C. 20016, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

---

[1] All of the individual plaintiffs concurrently move to waive their obligations under Local Rule 102.2(a) to provide addresses, on the basis of their objectively reasonable fear that publicizing their home addresses would subject Plaintiffs to harassment (potentially including violence) and threats.

## I.    NATURE OF ACTION

1.    Plaintiffs seek to enjoin the unlawful termination of El Salvador's designation as a Temporary Protected Status ("TPS") country.  El Salvador's TPS designation has been renewed eleven times since 2001 when devastating earthquakes ravaged the country.  As recently as 2016, the U.S. Government recognized that disrupted living conditions in El Salvador stemming from those earthquakes and exacerbated by subsequent natural disasters and additional environmental challenges continue to preclude safe return to the country, and allowed eligible Salvadorans to remain in the United States with protected status.

2.    Much of the original destruction caused by the 2001 earthquakes remains unrepaired, and the additional natural disasters and environmental challenges have both impeded recovery and caused new damage.  The result is that housing shortages continue, infrastructure remains crippled, and the El Salvador economy has stagnated, as underemployment and violence in the country have grown.  Recognizing the lack of safety in El Salvador, the U.S. Department of State recently issued a Level 3 Travel Advisory for the country that advises U.S. citizens to "reconsider travel" there.[2]

3.    In spite of these continuing crises, on January 8, 2018, the Administration of President Donald J. Trump (the "Administration") announced the termination of El Salvador's TPS designation, and ten days later published a notice of termination in the Federal Register. The termination notice ignores the dire conditions that continue to plague El Salvador and would jeopardize the safety and security of the individually named Plaintiffs, as well as members of CASA de Maryland and other Salvadorans with protected status, if they are forced to return.  The

---

[2] U.S. Dept. of State, *El Salvador Travel Advisory*, Jan. 10, 2018, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/el-salvador-travel-advisory.html.

2016 decision to extend El Salvador's TPS designation, like the extension decisions before it, gave careful consideration to the facts and statistics on the state of El Salvador's infrastructure, housing, economy, employment and level of violence, and made an objective assessment of whether their cumulative effect on living conditions in the country permit safe return.  The 2018 termination notice, by contrast, consists largely of unsupported and conclusory assertions that the varied crises in the country that repeatedly compelled prior extensions of El Salvador's protected status have suddenly been resolved.

4.      The about-face decision to terminate El Salvador's designation as a TPS country would seem inexplicable.  Except that it came on the heels of President Trump calling El Salvador and other TPS-designated countries "shithole countries" and was preceded by repeated statements during the President's campaign and presidency that disparage Latino immigrants. Indeed, multiple federal courts, including the Fourth Circuit Court of Appeals, have recognized such statements by the President as evidence of unconstitutional animus in considering challenges to other anti-immigrant measures adopted by the Trump Administration, namely the travel ban on persons from majority Muslim countries and the rescission of the Deferred Action on Childhood Arrivals ("DACA") program.  Here too, the President's statements, as well as his Administration's actions in support of its anti-immigrant agenda, expose an unconstitutional motivation behind the termination of El Salvador's TPS designation.

5.      The United States Constitution forbids the use of Executive power to discriminate against persons because of their race, ethnicity or national origin, and authorizes the Judiciary to intervene to stop such abuse of power.  The Administration has abused its authority over TPS to advance an unconstitutional motive.  Judicial intervention is necessary to stop the abuse.

## II.    JURISDICTION AND VENUE

6.        Jurisdiction is proper under 28 U.S.C. § 1331.

7.        This action arises under Fifth Amendment of the United States Constitution, the Immigration and Naturalization Act and the Administrative Procedure Act.

8.        Venue is proper in this district under 28 U.S.C. § 1391(e).

## III.    THE PARTIES

9.        Plaintiff CASA de Maryland, Inc. ("CASA") is a non-profit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia and Pennsylvania.  Founded in 1985, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 90,000 members. CASA counts more than 5,000 TPS beneficiaries as members and more than 34,700 members overall who have ties to El Salvador.  Salvadorans make up the dominant part of CASA's diverse membership base. Overall, CASA's mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities.  In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, as well as the greater Washington D.C. metropolitan area, Virginia, and Pennsylvania.  CASA has a long and robust track record of providing services to the TPS community, having provided assistance on over 500 TPS renewal applications.

10.       Plaintiff Jose E. Guevara is a resident of in Maryland.  He is a national of El Salvador has been a TPS beneficiary since 2001.

11.       Plaintiff Juan Rodriguez is a resident of Maryland and is national of El Salvador. He has been a TPS beneficiary since 2001.

4

12.     Plaintiff Luis Andrade is a resident of Virginia and is a national of El Salvador. He has been a TPS beneficiary since 2001.

13.     Defendant Donald J. Trump is the President of the United States.  He is the head of the Administration and oversees the cabinet agencies and heads, including the Department of Homeland Security and the Secretary of Homeland Security.

14.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet agency of the United States that has responsibility for administering federal immigration laws and programs, including TPS.

15.     Defendant Kirstjen M. Nielsen is the Secretary of Homeland Security (the "Secretary").

## IV.    STATUTORY BACKGROUND

16.     The Immigration and Nationality Act of 1990, 8 U.S.C. §§ 1101 to 1537 ("INA"), authorizes the Attorney General to designate a country for protected status as follows:

> [A]fter consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if—
>
> (A) the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) the Attorney General finds that—
> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
> (iii) the foreign state officially has requested designation under this subparagraph; or
>
> (C) the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that

permitting the aliens to remain temporarily in the United States is contrary to the
national interest of the United States.

8 U.S.C. § 1254a(b)(1); *accord* H.R. Rep. No. 101-245, at 13 (1989).

17.     In 2003, Congress transferred authority for TPS designation, extension and

termination to the Secretary.  6 U.S.C. § 557. [3]

18.     TPS allows eligible nationals of a designated country (as well as individuals with

no nationality who last habitually resided in the country) who are present in the United States at

the time of the designation and meet other eligibility criteria to remain lawfully in the United

States for the duration of the designation.  8 U.S.C. § 1254a(a), (c).

19.     The INA provision for TPS is designed to provide "a more formal and orderly

mechanism for the selection, processing, and registration" of individuals "from countries

experiencing turmoil."  H.R. Rep. No. 100-627, at 4.

20.     The INA provides for periodic review of TPS designations at least 60 days before

the end of the initial designation period or any extended designation period.  8 U.S.C.

§ 1254a(b)(3)(A).  It directs the Secretary to consult with "appropriate agencies of the

Government," "review the conditions in the foreign state (or part of such foreign state) for which

a designation is in effect . . ." and "determine whether the conditions for such designation under

this subsection continue to be met."  *Id.*

21.     The INA provides for termination of TPS as follows:

If the Attorney General determines under subparagraph (A) that a foreign state (or
part of such foreign state) no longer continues to meet the conditions for
designation under paragraph (1), the Attorney General shall terminate the
designation by publishing notice in the Federal Register of the determination
under this subparagraph (including the basis for the determination). Such
termination is effective in accordance with subsection (d)(3), but shall not be

---

[3] Thus, references to the Attorney General in the original provisions of the INA are now deemed
to refer to the Secretary of Homeland Security.  *See* Pub. L. No. 107-296, 116 Stat. 2135.

effective earlier than 60 days after the date the notice is published or, if later, the
expiration of the most recent previous extension under subparagraph (C).

8 U.S.C. § 1254a(b)(3)(B).

22.    The INA also provides for extension of TPS designation:

If the Attorney General does not determine under subparagraph (A) that a foreign
state (or part of such foreign state) no longer meets the conditions for designation
under paragraph (1), the period of designation of the foreign state is extended for
an additional period of 6 months (or, in the discretion of the Attorney General, a
period of 12 or 18 months).

8 U.S.C. § 1254a(b)(3)(C).

## V.    FACTUAL BACKGROUND

### A.    Initial TPS Designation of El Salvador

23.    On January 13, 2001, a 7.6 magnitude earthquake struck El Salvador, followed by

powerful aftershocks, leaving 1,100 people dead, some 2,500 missing, and approximately 8,000

injured.  Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg.

14214 (Mar. 9, 2001).  At the time, it was estimated that the earthquakes and subsequent

landslides displaced 1.3 million people, caused nearly $3 billion in damages, including damage

or destruction of over 200,000 homes and public buildings, among them 1,696 schools.  *Id.*

24.    After considering the extensive devastation of the 2001 earthquakes, and

following the Salvadoran government's formal request for protected status, the administration of

President George W. Bush designated El Salvador as a TPS country.  On March 2, 2001 his

administration announced that Salvadorans who had been residing in the United States since

February 13, 2001 would be eligible to apply for protected status, which if granted prevented

their removal.[4]  The notice of designation was published in the Federal Register one week later

on March 9, 2001.  66 Fed. Reg. 14214.

**B.  Extensions of TPS Designation Based on Unimproved Country Conditions**

25.  Between 2002 and 2016, the Attorney General and, after transfer of TPS authority

to the Secretary of Homeland Security, the Secretary extended El Salvador's protected status

eleven times.  For each extension, the Attorney General or the Secretary relied on a

contemporaneous review of the conditions in El Salvador prepared by the Department of State or

its recommendation to extend the protected status.[5]

a.  On July 11, 2002, the Attorney General extended the designation of El Salvador,

citing reports from May 2002 by the Immigration and Naturalization Service

Resource Information Center and the Department of State concluding "that the

conditions that warranted TPS designation continue[d] to exist."[6]  Those reports

observed, *inter alia*, that more than 75% of the road infrastructure needed

rebuilding, and that recovery from the earthquakes was hindered by a subsequent

drought.[7]

b.  On July 16, 2003, the Secretary extended El Salvador's TPS designation until

March 9, 2005.[8]  This notice specifically cited a recommendation from the

---

[4] President Bush Announces El Salvador Designated For Temporary Protected Status Following Devastating Earthquakes, (March 2, 2001, https://www.uscis.gov/sites/default/files/files/pressrelease/BushElSalvadorEng_030201.pdf.
[5] *See infra* notes 4-32 and accompanying text.
[6] Extension of the Designation of El Salvador Under the Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for Salvadorans, 67 Fed. Reg. 46000 (July 11, 2002).
[7] *Id*. at 46000 – 46001 (July 11, 2002).
[8] Extension of the Designation of El Salvador Under Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for El Salvador, 68 Fed. Reg. 42071, 42072 (July 16, 2003).

Department of State, dated April 13, 2003, that "[a]lthough El Salvador ha[d] made progress in its post-earthquake reconstruction effort, much work remain[ed]."[9]  The Department of State also recommended the extension because the "large number of returnees from the United States would not be able to find jobs, or possibly housing, creating social unrest and exacerbating a critical crime situation and already dismal living conditions."[10]

c.  On January 7, 2005, the Secretary extended El Salvador's TPS designation until September 9, 2006.[11]  This notice, like previous notices of extension, specifically cited recommendations from the Department of State and the U.S. Citizenship and Immigration Services Resource Information Center.[12]  Those reports observed that only one-third of the houses destroyed or damaged in the 2001 earthquakes had been rebuilt or were under construction, over 240 schools needed rebuilding, and no hospitals had been rebuilt.[13]

d.  On June 15, 2006, the Secretary extended El Salvador's TPS designation until September 9, 2007.[14]  The notice of extension, like previous notices, referred to a recommendation by the Department of State; it also cited research by the USCIS Office of Refugee, Asylum, and International Operations, documented in a report

---

[9] *Id*. at 42072.

[10] *Id*.

[11] Automatic Extension of Employment Authorization Documentation for El Salvador TPS Beneficiaries, 70 Fed. Reg. 1450, 1451 (Jan. 7, 2005).

[12] *Id*. at 1451.

[13] *Id*.

[14] Extension of the Designation of Temporary Protected Status for El Salvador; Automatic Extension of Employment Authorization Documentation for El Salvadorian TPS Beneficiaries, 71 Fed. Reg. 34637 (June 15, 2006).

on conditions on rebuilding efforts.[15]  Those reports stated that only 46 percent of the homes damaged or destroyed had been repaired in the five years since the earthquakes, reconstruction on the country's seven main hospitals was still pending, and that recovery efforts were curtailed by a 2005 volcanic eruption, as well as flooding and mudslides from a hurricane.[16]

e.  On August 21, 2007, the Secretary extended El Salvador's TPS designation until March 9, 2009.[17]  Citing a request by the government of El Salvador for the extension and a review of the country conditions by DHS and the Department of State, DHS determined "that the conditions that prompted the designation of El Salvador for TPS continue[d] to be met."[18]  The extension notice observed that only 50 percent of the homes damaged by the earthquakes had been repaired and only two of the seven main hospitals in the country were undergoing reconstruction, while the others were in various stages of pre-reconstruction.[19]

f.  On October 1, 2008, the Secretary extended El Salvador's TPS designation until September 9, 2010, citing a year-long review of the country conditions by DHS and the Department of State.[20]  This extension notice stated that still only half of

---

[15] *Id.*

[16] *Id.* at 34637-8.

[17] Extension of the Designation of El Salvador for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 72 Fed. Reg. 46649 (Aug. 21, 2007).

[18] *Id.*

[19] *Id.* at 46650.

[20] Extension of the Designation of El Salvador for Temporary Protected Status, 73 Fed. Reg. 57128, 57129 (Oct. 1, 2008).

the almost 300,000 damaged or destroyed homes had been rebuilt or repaired and reconstruction of only one of the seven main hospitals was complete.[21]

g.  On July 9, 2010, the Secretary extended El Salvador's TPS designation until March 9, 2013, citing a year-long review of the country conditions by DHS and the Department of State.[22]  Among the facts presented to warrant the extension was that "Department of State… report[ed] that of the 276,000 homes destroyed in 2001, only approximately half have been rebuilt to date."[23]  The notice also pointed to post-2001 natural disasters, including a tropical storm and a volcanic eruption in 2005, a series of earthquakes in 2006, and a hurricane in 2009, as factors contributing to the decision to extend the TPS designation.[24]

h.  On January 11, 2012, the Secretary extended El Salvador's TPS designation until September 9, 2013, citing a year-long review of country conditions by DHS and Department of State.[25]  This extension notice also pointed out that "rebuilding efforts have been further complicated by more recent natural disasters," including "Hurricanes Adrian and Stan in 2005, Hurricane Felix in 2007, Hurricane Ida in 2009, and . . . Tropical Storm Agatha in 2010."[26]  Half of the 276,000 destroyed or

---

[21] *Id.* at 57129.
[22] Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 75 Fed. Reg. 39556, 39557 (July 9, 2010).
[23] *Id.* at 39557- 39558.
[24] *Id.* at 39558.
[25] Extension of the Designation of El Salvador for Temporary Protected Status, 77 Fed. Reg. 1710, 1711 (Jan. 11, 2012).
[26] *Id.* at 1712.

damaged homes from the earthquake were still in need of rebuilding or repairing.[27]

i.  On May 30, 2013, the Secretary extended El Salvador's TPS designation until March 9, 2015, noting that DHS and Department of State had conducted a year-long review of the country conditions and citing reports by USAID of the continuing effects of the 2001 earthquakes and the impact of subsequent natural disasters as "slow[ing] and disrupt[ing]" recovery, and "compound[ing] the already substantial disruption to living conditions resulting from the 2001 earthquakes."[28]

j.  On January 7, 2015, the Secretary extended El Salvador's TPS designation until September 9, 2016.[29]  Again, DHS noted that both it and the Department of State had conducted a year-long review of the conditions in El Salvador.[30]  The reasons for the extension included not only the continued disruption to living conditions from the 2001 earthquake, but also subsequent natural disasters, including a 2005 tropical storm, a 2006 earthquake, tropical storms in 2009 and 2010, a tropical depression in 2011, another tropical storm in June 2013, and an earthquake in December 2013.  The extension notice cited "[t]hese environmental disasters, as well as others not detailed herein, [as having] caused substantial setbacks to infrastructure recovery and development since the 2001 earthquakes."[31]  In

---

[27] *Id.*

[28] Extension of the Designation of El Salvador for Temporary Protected Status, 78 Fed. Reg. 32418, 32419 (May 30, 2013).

[29] Extension of the Designation of El Salvador for Temporary Protected Status, 80 Fed. Reg. 893, 894 (January 7, 2015).

[30] *Id*. at 894.

[31] *Id*. at 894-895.

addition, the extension referenced a reported "housing deficit … of 446,000, a profound deficit for a country of 6.1 million people," which would only be "exacerbated by the return of thousands of Salvadoran nationals currently residing in the United States under TPS."[32]

26.    On July 8, 2016, the Secretary extended El Salvador's TPS designation until March 9, 2018.  Extension of the Designation of El Salvador for Temporary Protected Status, 81 Fed. Reg. 44645 (July 8, 2016).[33]  As with all previous extensions, the notice stated that the decision reflects a comprehensive review of current country conditions.  *Id.* at 44647.  The reasons given for this extension of TPS included the continuing effects of the 2001 earthquake—as well as the effects of "subsequent natural disasters and environmental challenges," and the increase in violence and insecurity due in part to the "significant criminal gang activity."  *Id.*  Among the issues impacting the decision were a housing deficit of approximately 630,000 houses, with homes from the earthquake still in need of rebuilding, a regional drought contributing to food insecurity, a coffee rust epidemic, outbreak of mosquito borne illnesses, a lack of potable water affecting ten percent of the population, a workforce in which approximately one third of the population was underemployed or unable to find full-time work, and a poverty rate of nearly 32 percent.  *Id.*

## C.    January 2018 Announcement of Termination

27.    Since the last extension of El Salvador's TPS designation in 2016, very little in that country has changed.  As described herein, *see* section D, *infra*, an overwhelming number of

---

[32] *Id.* at 894.
[33] The re-registration deadline was later extended to March 19, 2018.  *See* USCIS, *Temporary Protected Status Designated Country: El Salvador* (last reviewed/updated: 01/18/2018), https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-el-salvador.

the conditions that supported the 2016 extension, as well as the initial designation and other extensions, are still present. Some conditions have worsened. Persistent infrastructure failures and housing shortages, multiple natural disasters, pervasive violence and lack of security, and relentlessly poor economic prospects continue to impede recovery efforts from the 2001 earthquakes and subsequent exacerbating natural disasters. Substantially disrupted living conditions remain a critical issue in El Salvador. Further, high displacement rates of persons living in El Salvador, as well as the country's high underemployment and poverty rates, preclude integration of tens of thousands of returned workers into the country's labor market.

28.     Despite the well-documented continuing crises in El Salvador, on January 8, 2018, the Secretary announced that the country's TPS designation would be terminated,[34] and ten days later DHS published a notice of the termination decision in the Federal Register. 83 Fed. Reg. 2654 (Jan. 18, 2018). The notice states that the termination of El Salvador's TPS designation will be effective on September 9, 2019. *Id.*

**D.      Continued Dire Conditions in El Salvador**

29.     Multiple conditions in El Salvador continue to substantially disrupt living conditions, precluding the safe return of large numbers of Salvadoran nationals after years, and in some cases decades, in the United States.

**Compromised Housing and Infrastructure Resulting from Multiple
Natural Disasters**

30.     Not only have conditions not improved since the last designation of TPS for El Salvador in 2016, they have actually worsened. Throughout 2016, natural disasters led to the

---

[34] Press Release, Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for El Salvador (Jan. 8, 2018), https://www.dhs.gov/news/2018/01/08/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

displacement of significant numbers of Salvadorans and caused major infrastructure damage in the country,[35] further reducing any gains made in recovering from the 2001 earthquakes.  In November 2016, a 7.0-magnitude earthquake struck El Salvador, prompting evacuations in coastal areas.[36]  Less than five months later, in April 2017, a 5.1-magnitude earthquake—the strongest of more than 50 registered earthquakes that shook El Salvador over a 24-hour period—caused landslides and damaged homes and roads throughout the country.[37]

31.    In 2017, torrential rains and storms further damaged El Salvador's infrastructure. In June 2017, flooding from intense rains engulfed more than 150 homes, forced the evacuation and displacement of hundreds of people, damaged streets, highways, and bridges, and led to multiple deaths and injuries.[38]  Heavy rains again struck the country in September 2017, causing additional deaths, injuries, and damage to dozens of roads, highways, and homes.[39]

32.    Habitat for Humanity reports that El Salvador continues to suffer from critical housing shortages, affecting nearly one million families, with 6 out of 10 families living in

---

[35] IDMC, Global Report on Internal Displacement (May 2017), at 114, http://www.internal-displacement.org/global-report/grid2017/pdfs/2017-GRID.pdf.

[36] Guy Birchall, *Tsunami Danger El Salvador hit by massive 7 magnitude earthquake as a tsunami warning is issued*, THE SUN, (Nov. 24, 2016, 8:07 p.m., updated Nov. 24, 2016, 8:29 p.m.), https://www.thesun.co.uk/news/2258714/el-salvador-hit-by-massive-7-2-magnitude-earthquake-as-a-tsunami-warning-is-issued/.

[37] Telesur, *At Least 1 Dead in El Salvador After 5.1 Magnitude Earthquake*, Telesurtv.net (Apr. 10, 2017), https://www.telesurtv.net/english/news/At-Least-One-Dead-in-El-Salvador-After-5.1-Magnitude-Earthquake-20170410-0038.html.

[38] Associated Press, *3 dead, hundreds displaced in El Salvador flooding*, DAILY MAIL (June 16, 2017, 12:10 EST), "http://www.dailymail.co.uk/wires/ap/article-4611600/3-dead-hundreds-displaced-El-Salvador-flooding.html; Gobierno de la República de El Salvador, Ministerio del Interior, Dirección General de Protección Civil,  Informe Preliminar de Affectaciones por Lluvias Desde el 13 de Junio a la Fecha Nº 8, (June 21, 2017), http://proteccioncivil.gob.sv/informe-preliminar-de-afectaciones-por-lluvias-desde-el-13-de-junio-a-la-fecha-n-8-21junio2017/.

[39] Uveli Alemán, *Dos muertes y 39 evacuados por lluvias del fin de semana,* EL MUNDO (Sept. 25, 2017), http://elmundo.sv/dos-muertes-y-39-evacuados-por-lluvias-del-fin-de-semana/.

inadequate housing.[40]  In 2017, a United Nations organization reported that the country's

housing deficit was 360,000 homes.[41]

### Weak Economy and Persistent Poverty

33.     El Salvador continues to suffer from persistently low levels of economic growth

and the significant challenges to its economy that the 2016 extension notice recognized.[42]  The

Salvadoran economy grew by only 2.4 percent in 2016, and is predicted to grow by only 2.3

percent in 2017.[43]  This stagnant rate of economic expansion has made El Salvador the slowest

growing economy in Central America.[44]  By comparison, Gross Domestic Product ("GDP")

growth in Nicaragua in 2016 was approximately 4.6 percent,[45] and 4.8 percent in Panama.[46]

34.     Available data on labor market conditions show no improvement since the 2016

TPS renewal for El Salvador.  In May 2017, a report by El Salvador's Director General of

Statistics and Census stated that approximately one-third of the country's urban labor force

---

[40] Habitat for Humanity, *Habitat for Humanity in El Salvador*, habitat.org (last visted Mar. 7, 2018), https://www.habitat.org/where-we-build/el-salvador; Habitat for Humanity, *Country Profile El Salvador*, habitat.org, https://www.habitat.org/sites/default/files/ElSalvador_CP_June2017-2.pdf.

[41] SDGF, *Case Study Sustainable urban development in El Salvador*, sdgfund.org (2017) at 2, http://www.sdgfund.org/case-study/sustainable-urban-development-el-salvador.

[42] USAID, *Economic Opportunities,* USAID (last updated: Jan. 2, 2018), https://www.usaid.gov/el-salvador/economic-opportunities.

[43] Forbes Staff, *El Salvador cerrará con un crecimiento de 2.4% en 2017*, FORBES MÉXICO (Dec. 13, 2017), https://www.forbes.com.mx/el-salvador-cerrara-con-un-crecimiento-de-2-4-en-2017/.

[44] The World Bank, *The World Bank In El Salvador,* worldbank.org (2018), http://www.worldbank.org/en/country/elsalvador/overview.

[45] The World Bank, *The World Bank in Nicaragua,* http://www.worldbank.org/en/country/nicaragua/overview (last updated Oct. 10, 2017).

[46] The World Bank, *The World Bank in Panama,* http://www.worldbank.org/en/country/panama/overview (last updated Oct. 10, 2017).

remains underemployed or unable to find full-time work. [47]  That report observed that over 40

percent of Salvadoran households live in poverty or extreme poverty.[48]

35.    Remittances—money sent from Salvadoran nationals living abroad—remain

critical to El Salvador's economy.  In 2016, remittances were the country's greatest single source

of income and, surpassing $4.5 billion, accounted for approximately 17% of El Salvador's

GDP.[49]  El Salvador's Central Bank documented a 10.5% increase in remittances during the first

half of 2017,[50] and from January through November of 2017, $4.51 billion in remittances were

sent to homes in El Salvador.[51]  Over 97% of the remittances sent to El Salvador come from

relatives residing in the United States.[52]  The amount of remittances sent annually to El Salvador

dwarfs the $88 million that El Salvador received in aid from the United States in 2017.[53]

---

[47]  Gobierno de la República de El Salvador, Ministerio de Economía, Dirección General de
Estadística y Censos, *Encuesta de Hogares de Propósitos Múltiples 2016* at 31, 42,
http://www.digestyc.gob.sv/index.php/temas/des/ehpm/publicaciones-
ehpm.html?download=616%3Apublicacion-ehpm-2016.
[48] *Id.*
[49] Joshua Partlow, *Salvadorans fear TPS decision will be a huge economic blow but pin hopes on
Congress*, WASHINGTON POST (Jan. 8, 2018),
https://www.washingtonpost.com/world/the_americas/salvadorans-fear-tps-decision-will-be-a-
huge-economic-blow-to-their-country/2018/01/08/eefd9ab4-f486-11e7-9af7-
a50bc3300042_story.html?utm_term=.3a2f19da9288; The World Bank, *Personal remittances,
received (% of GDP)*,
https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?end=2016&locations=SV&star
t=1976.
[50] Banco Central de Reserva de El Salvador, *Remesas familiars crecen 10.5% en el primer
semestre y alcanzan US$2,454.2 millones* (July 18, 2017),
http://www.bcr.gob.sv/bcrsite/uploaded/content/category/756736864.pdf.
[51] Patrick Gillespie, *Trump clamps down on El Salvador's 'lifeline'*, CNNMoney (Jan. 8, 2018,
5:32PM ET), http://money.cnn.com/2018/01/08/news/economy/el-salvador-
remittances/index.html.
[52] Banco Central de Reserva de El Salvador, *Remesas familiars crecen 10.5% en el primer
semestre y alcanzan US$2,454.2 millones* (July 18, 2017),
http://www.bcr.gob.sv/bcrsite/uploaded/content/category/756736864.pdf
[53] Gillespie, *supra* note 51.

According to data provided by the Salvadoran government in April 2017, approximately one in five Salvadoran households receives remittances.[54]

36.     Cessation of remittances from TPS holders could have catastrophic consequences on the already-fragile Salvadoran economy.[55]

**Pervasive Violent Crime and Lack of Safety**

37.     Gang and criminal violence recognized in the 2016 extension notice continues to destabilize El Salvador.

38.     El Salvador has one of the world's highest homicide rates.[56]  According to one expert, El Salvador's homicide rate in 2001, the year of its TPS designation, was six people per day.[57]  In 2017, the homicide rate was nearly twice that rate.[58]

---

[54] Banco Central de Reserva de El Salvador, *Remesas familiares registran crecimiento de 12.4% al primer trimestre de 2017* (April 24, 2017), http://www.bcr.gob.sv/bcrsite/uploaded/content/category/2017028216.pdf.

[55] *See* Gillespie, *supra* note 51; Ryan Devereaux, *Ignoring Violence in El Salvador, Trump Ends Years of Special Protective Status for Immigrants*, THE INTERCEPT (Jan. 8, 2018), https://theintercept.com/2018/01/08/el-salvador-immigration-tps-trump/.

[56] Raymond Bonner, *America's Role in El Salvador's Deteriorati*on, The Atlantic (Jan. 20, 2018), https://www.theatlantic.com/international/archive/2018/01/trump-and-el-salvador/550955/; Reuters Staff, *U.N. finds possible extrajudicial killings in El Salvador gang offensive*, Reuters (Feb. 5, 2018), https://www.reuters.com/article/us-el-salvador-violence/u-n-finds-possible-extrajudicial-killings-in-el-salvador-gang-offensive-idUSKBN1FQ0E1.

[57] Josh Boswell, *Donald Trump's decision to expel Salvadorans could empower deadly MS-13 gang, warn experts*, THE TELEGRAPH (Jan. 14, 2018), http://www.telegraph.co.uk/news/2018/01/14/donald-trumps-decision-send-salvadorans-home-could-empower-deadly/.

[58] Boswell, *supra* note 57.

39.     In 2016, as reported by USAID, the murder rate in El Salvador was 81 per

100,000 people[59]; in comparison, the U.S. rate for the same year was 5.4 per 100,000."[60]  Since

January 2010, at least 38 U.S. citizens have been murdered in El Salvador. [61]

40.     According to the U.S. Department of State, nearly one out of every five persons in

El Salvador has been a victim of violent crime.[62]

41.     Since at least January 2016, the U.S. Department of State has warned U.S.

citizens that "crime and violence levels in El Salvador remain critically high."[63]

42.     On January 10, 2018, the U.S. State Department issued a Level Three travel

advisory for El Salvador that warns travelers to "[r]econsider travel" to the country "due to

crime."[64]  The advisory states that "[v]iolent crime, such as murder, assault, rape, and armed

robbery, is common," and that "[g]ang activity, such as extortion, violent street crime, and

narcotics and arms trafficking, is widespread."[65]  The advisory also states that "[l]ocal police

may lack the resources to respond effectively to serious criminal incidents."[66]

---

[59] USAID, *USAID/El Salvador Country Fact Sheet*, Nov. 2017,
https://www.usaid.gov/sites/default/files/documents/1862/El_Salvador_External_Fact_Sheet_-_November_2017.pdf.
[60] FBI, *2016 Crime in the United States*, Table 11, https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/tables/table-11.
[61] U.S. Embassy El Salvador, *Security Message for U.S. Citizens: Travel Warning – El Salvador*,
Jan. 15, 2016, https://sv.usembassy.gov/sm-01152016/.
[62] Dept. of State, *El Salvador 2016 Human Rights Report* (report updated 4/12/2017) at 1,
https://www.state.gov/documents/organization/265798.pdf.
[63] U.S. Embassy El Salvador, *supra* note 61.
[64] U.S. Dept. of State, *supra* note 2.
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/el-salvador-travel-advisory.html.
[65] *Id.*
[66] *Id.*

43.     For women and girls in particular, El Salvador has been identified as one of the world's deadliest countries.[67]  Approximately ten women per day experience violence or sexual assault in El Salvador, and 7 of every 10 victims of sexual violence are under the age of 20.[68]

44.     A delegation from the Migration and Refugee Services of the U.S. Conference of Catholic Bishops ("USCCB Delegation") traveled to El Salvador in August 2017 to examine the country's conditions, and it found that violence was pervasive and permeated most aspects of Salvadoran society.[69]  The USCCB Delegation's report stated that crime, including extortion, appeared to "be increasing" in gang-infiltrated areas of El Salvador, and that the failure to satisfy extortion or gang recruitment demands resulted in entire families becoming vulnerable to forced displacement from their homes.[70]

45.     In a report published in August 2017, the U.N. World Food Programme identified the violence in El Salvador as "a humanitarian emergency" that "has significantly impeded development" in the country.[71]  Violence and the need to escape from life-threatening situations was identified as one of the principal motivations for Salvadoran emigration.[72]

46.     A significant portion of El Salvador's population continues to be displaced by criminal and gang violence.  The State Department's 2017 Salvadoran Human Rights Report stated that over 48,000 students dropped out of school in 2015 due to gang threats, crime, or

---

[67] Catalina Lobo-Guerrero, Opinion, *In El Salvador, 'Girls Are a Problem'*, N.Y. TIMES (Sept. 2, 2017), https://www.nytimes.com/2017/09/02/opinion/sunday/el-salvador-girls-homicides.html.
[68] *Id.*
[69] U.S. Conf. of Catholic Bishops/Migration & Refugee Services, *Temporary Protected Status: A Vital Piece of the Central American Protection and Prosperity Puzzle* (Oct. 2017), at 4, http://www.usccb.org/about/migration-policy/fact-finding-mission-reports/upload/el-salvador-honduras-report-20171016.pdf.
[70] *Id.*
[71] U.N. World Food Programme, *Food Security and Emigration* (Aug. 2017), at 23, https://reliefweb.int/sites/reliefweb.int/files/resources/WFP-0000022124.pdf.
[72] *Id.*  at 15, 19.

forced displacement due to gang activity.[73]  In 2017, the Internal Displacement Monitoring

Centre ("IDMC") estimated that nearly 220,000 people were forced to flee violence in El

Salvador in 2016 alone, ranking El Salvador second in the world in the number of new

displacements relative to population size.[74]  The USCCB Delegation noted that the estimated

number of displaced persons in El Salvador is a "contested issue," ranging from 220,000 to

400,000.[75]  Both the IDMC and the USCCB Delegation observed that the Salvadoran

government has failed to acknowledge the scale of this displacement and has yet to establish a

national strategy or legislative framework to comprehensively monitor, address, or respond to the

displacement or its motivating violence.[76]

      47.     In March 2017, the Department of State issued a report on El Salvador's human

rights practices.[77]  This report described rampant human rights abuses throughout El Salvador

that "stem[] from . . . widespread extortion and other crime," "widespread corruption," "weak

rule of law, which contributed to high levels of impunity and government abuse, including

unlawful killings by security forces," "widespread" violence against women and girls, and the

commercial sexual exploitation of women and children.[78]  The report observed that impunity

persisted despite government attempts to remedy the violence and abuse.[79]

---

[73] Dept. of State, *El Salvador 2016 Human Rights Report* (Mar. 2017), at 17,
https://www.state.gov/documents/organization/265798.pdf.
[74] IDMC, *supra* note 35, at 10, 22.
[75] U.S. Conf. of Catholic Bishops/Migration & Refugee Services, *supra* note 69, at 8.
[76] IDMC, *supra* note 35 at 22; U.S. Conf. of Catholic Bishops/Migration & Refugee Services,
*supra* note 69 at 8.
[77] Dept. of State, *supra* note 73, at 1.
[78] *Id.* at 1, 21.
[79] *Id.* at 1.

**E.    Multiple Leaders Urged the Administration to Extend TPS Designation for El Salvador**

48.    Recognizing that conditions that served as the basis for designating El Salvador as a protected status country and for every extension have not significantly improved, and following signals from the Administration that El Salvador's TPS designation would be terminated, throughout the later part of 2017 and into January 2018 numerous government officials, legislators, industry leaders, and faith-based organizations implored the Administration to extend rather than rescind the designation.  Their entreaties fell on deaf ears.

49.    For example, on September 11, 2017, a bipartisan group of 116 lawmakers wrote former Acting DHS Secretary Elaine Duke strongly urging the Administration to extend TPS designations for El Salvador and Honduras. [80]  The letter emphasized that "conditions have not sufficiently improved since the most recent extension," and recognized that violence and scarce job opportunities continue to impede recovery from the natural disasters that led to the original TPS designation. [81]  The lawmakers wrote that "[t]he potential return of hundreds of thousands of former TPS holders to . . . El Salvador would likely bring destabilizing consequences throughout the region."[82]

50.    On October 19, 2017, U.S. Senators Ben Cardin and Chris Van Hollen of Maryland led twenty colleagues in sending a letter to Secretary of State Rex Tillerson and Acting Secretary Duke that urged the Trump Administration to extend TPS designations for El Salvador as well as Honduras.  They cited the environmental, economic, and security challenges, natural

---

[80]  Letter from James McGovern, *et al.*, Member of Congress to Hon. Elaine C. Duke, Acting Secretary, Dept. of Homeland Security (Sept. 11, 2017), https://mcgovern.house.gov/uploadedfiles/tps_2017_-_extend_tps_salvadorans-hondurans-to_elaine_duke-dhs-final.pdf.
[81] *Id.*
[82] *Id.*

disasters, high levels of violence and insecurity, high rates of sexual violence and poverty that

continue to preclude recovery in El Salvador. [83]  "Clearly," the letter continued, "neither [El

Salvador nor Honduras] has the capacity and resources at this time to safely absorb the return of

tens of thousands of their nationals," and their forced return will "have destabilizing

consequences, strain[] recovery efforts and exacerbat[e] existing challenges to achieving

sustained economic growth and development."[84]

     51.     On October 26, 2017, the U.S. Chamber of Commerce called on the Trump

administration to extend TPS designations for El Salvador and other countries.  The letter

emphasized that "[t]he labor force participation for [El Salvador's] TPS populations is over

80%," and that loss of employment authorization for TPS holders "would adversely impact

several key industries where TPS recipients make up a significant amount of the workforce,"

specifically food processing, hospitality, home healthcare services and construction.[85]

     52.     On October 31, 2017, the USCCB sent a letter urging Acting Secretary Duke to

extend the TPS extensions for El Salvador and Honduras.  Based on their August 2017

delegation trip to these two countries and first-hand observations described above, *see ¶* 44,

*supra*, the USCCB delegation determined that the Salvadoran government would be unable to

ensure citizen safety, remedy humanitarian concerns, or adequately integrate or protect returning

---

[83] Press Release, U.S. Senator Ben Cardin, Cardin, Van Hollen Urge Trump Administration to Extend Temporary Protected Status for Honduras and El Salvador (Oct. 19, 2017), https://www.cardin.senate.gov/newsroom/press/release/cardin-van-hollen-urge-trump-administration-to-extend-temporary-protected-status-for-honduras-and-el-salvador.
[84] *Id.*
[85] Letter from Neil L. Bradley, SVP & Chief Policy Officer, Chamber of Commerce of the United States to Hon. Elaine Duke, Acting Secretary, Dept. of Homeland Security (Oct. 26, 2017), https://www.uschamber.com/sites/default/files/171024_temporaryprotectedstatus_dhs_duke.pdf.

nationals.  Given the current country conditions, the letter advised, "[t]erminating TPS at this time would be inhumane and untenable."[86]

53.    On November 1, 2017, U.S. Representative Jimmy Gomez and 78 of his House colleagues wrote Acting Secretary Duke and White House Chief of Staff John Kelly urging the renewal of TPS designations for El Salvador and other countries.  The members of Congress observed that "[i]nfrastructure problems related to the[] [natural] disasters, including lack of potable water, housing shortage, widespread hunger, and unemployment continue to permeate the region," and that "staggering homicide rates," "transnational gang activity," and "violence continue[] to ravage El Salvador."[87]  They emphasized that "TPS recipients are hardworking contributors to the American economy and do not represent a risk to public safety," and that "[e]xtending TPS for . . . El Salvador . . . is a compassionate and pragmatic choice."[88]

54.    On December 21, 2017, Senator Cardin wrote to Secretary of State Rex Tillerson and Secretary Nielsen again requesting extension of El Salvador's TPS designation.  Senator Cardin observed that El Salvador "has consistently suffered per capita murder rates that have been among the worst in the world," and that "[t]hese troubling security statistics are compounded" by the poverty, a historic drought in 2016, and limited government resources in the country.  He wrote that "[t]he disorderly repatriation of [the nearly 200,000 individuals who

---

[86] Letter from USCCB, *et al.* to Hon. Elaine Duke, Acting Secretary, Dept. of Homeland Security (Oct. 31, 2017), https://justiceforimmigrants.org/2016site/wp-content/uploads/2017/10/Catholic-Partner-Letter-to-DHS-requesting-TPS-Ext.pdf.

[87] Letter from Jimmy Gonzalez, Member of Commerce, *et al.* to Hon. John Kelly, Chief of Staff, The White House and Hon. Elaine C. Duke, Acting Secretary, Dept. of Homeland Security (Nov. 1, 2017), https://gomez.house.gov/uploadedfiles/11-01-2017_congressman_jimmy_gomez_letter_to_white_house_cos_kelly_and_dhs_acting_secretary_duke_re_temporary_protected_status.pdf.

[88] *Id.*

would be subject to immediate deportation] . . . could potentially exacerbate already precarious conditions in the country" and "would create unnecessary burdens and separate families."[89]

55.    In early January 2018, Salvadoran officials, including President Salvador Sánchez Cerén, appealed to the Secretary not to rescind the TPS designation, explaining that it would wreak havoc on El Salvador's economy.[90]

## F.    Anti-Latino Immigrant Motivation Behind Termination

56.    The Administration's dismissal of the urgent and emphatic appeals described immediately above and its disregard of the continuing dire conditions in El Salvador reflect that the decision to terminate TPS was not motivated by an objective assessment of current conditions, but was driven by bias against Latino immigrants.  That bias is evidenced in the termination notice's cursory and inadequate review of the actual conditions in El Salvador, including its dismissal of facts about the actual conditions, and the President's multiple statements disparaging Latino and other immigrants of color.

### Insufficient Review of Current Conditions in El Salvador

57.    As described above, the 2016 decision to extend protected status for eligible Salvadorans and previous extension decisions were based on careful assessment of the facts, including statistics, on the conditions in El Salvador as they relate to safety, infrastructure, housing, employment, security, and other factors affecting living conditions.  In contrast, the January 18, 2018 termination notice fails to account for key facts and statistics about present-day

---

[89] Press Release, U.S. Senator Ben Cardin, Cardin Requests Extension of Protected Status for Salvadorans in the United States, (Dec. 21, 2017), https://www.cardin.senate.gov/newsroom/press/release/cardin-requests-extension-of-protected-status-for-salvadorans-in-the-united-states.

[90] Ryan Devereaux, *Ignoring Violence in El Salvador, Trump Ends Years of Special Protective Status for Immigrants*, THE INTERCEPT (Jan. 8, 2018), https://theintercept.com/2018/01/08/el-salvador-immigration-tps-trump/.

conditions in El Salvador.  Indeed, the magnitude of information that the Administration outright ignored strongly indicates that the disregard was not a mere oversight.

58.    The January 18, 2018 Federal Register notice states that DHS reviewed conditions in El Salvador, and based on that review and input from appropriate U.S. Government agencies "determined that the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met." *Id*. at 2655-56.  However, the termination notice fails to account for many of the grave conditions that previously warranted TPS extensions and, as described above, continue to persist in El Salvador.

59.    For example, the notice of termination states that "[r]ecovery efforts relating to the 2001 earthquakes have largely been completed," and asserts broadly that "[d]amaged schools and hospitals have been reconstructed and repaired, homes have been rebuilt, and money has been provided for water and sanitation and to repair damaged roads and other infrastructure." *Id*. at 2656.  Unlike the initial notice of designation and the notices of extension, the termination notice cites no statistics on those key country conditions.

60.    The notice fails to address the subsequent natural disasters that exacerbated the damage to the country's infrastructure and housing.  Notably, the notice offers no explanation of how—within the narrow span of a year and a half—El Salvador could have cured the 630,000 housing deficit (including homes that had not yet been rebuilt following the destruction of the 2001 earthquakes) that is identified in DHS's 2016 extension notice.  *Compare* 81 Fed. Reg. at 44647 *with* 83 Fed. Reg. at 2656.

61.    The termination notice states in conclusory fashion that "[t]he social and economic conditions affected by the earthquakes have stabilized," and that "people are able to

conduct their daily activities without impediments directly related to damage from the earthquakes." *Id.* It fails to account for the high rates of violence, food and water insecurity, and poverty, as well as the country's weak governance and public security crises, described above, that continue to disrupt living conditions in El Salvador.

62.    Indeed, two days after the Administration announced the termination of El Salvador's TPS designation the Department of State issued a travel advisory that contradicted the termination notice. As previously described, the Department of State advised reconsideration of travel to El Salvador and warned that "[v]iolent crime, such as murder, assault, rape, and armed robbery, is common," that "[g]ang activity, such as extortion, violent street crime, and narcotics and arms trafficking, is widespread," and that "[l]ocal police may lack the resources to respond effectively to serious criminal incidents."[91]

63.    The termination notice asserts that El Salvador's economy is "steadily improving." *Id.* The notice points to the country's unemployment rate, which remained consistent at seven percent in 2014 through 2016, as well as the fact that El Salvador's GDP reached a high of $26.80 billion in 2016. *Id.* However, prior extension notices cited El Salvador's high underemployment rate, which relate directly to the ability to find employment there. *See supra* ¶ 29. El Salvador's underemployment rate has not improved since the most recent TPS extension. *See supra* ¶ 37. The termination notice also fails to consider that El Salvador's GDP and economic stability is heavily dependent on U.S.-based remittances from TPS recipients, as set forth above, and that an end to those remittances would cause severe strains on an already fragile economy.

---

[91] U.S. Dept. of State, *supra* note 2.

64.    The termination notice acknowledges that "[g]overnment assistance and resources for returnees are reportedly limited," yet baldly asserts that the Salvadoran government, U.S. government, and international organizations are all cooperating "to improve security and economic opportunities in El Salvador" for the returned.  83 Fed. Reg. at 2656.  The notice provides no supporting details.

65.    Prior to the announcement that El Salvador's TPS designation would be terminated, White House Chief of Staff John Kelly pressured acting DHS Secretary Elaine Duke to terminate the TPS designation of Honduras, another Central American country, telling her that continuing the designation "prevents [the Administration's] wider strategic goal" on immigration, according to Administration officials.[92]  Duke resisted the pressure and, according to a White House official, told Kelly that she planned to resign.[93]  Current DHS Secretary Nielsen is reported to be a close confidant of Chief of Staff Kelly.[94]

**Disparaging Statements About Latino and Other Immigrants of Color**

66.    Throughout President Trump's campaign and presidency, he has repeatedly made statements that reflect an anti-immigrant animus based on race, ethnicity and national origin and are directed at immigrants from El Salvador, other Latino countries, and other TPS-designated

---

[92] Nick Miroff, *White House chief of staff tried to pressure acting DHS secretary to expel thousands of Hondurans, officials say*, WASHINGTON POST (Nov. 9, 2017), https://www.washingtonpost.com/world/national-security/white-house-chief-of-staff-tried-to-pressure-acting-dhs-secretary-to-expel-thousands-of-hondurans-officials-say/2017/11/09/914d3700-c54a-11e7-a441-3a768c8586f1_story.html?utm_term=.076d78250e7e.

[93] *Id.*

[94] Nick Miroff, *Senate confirms Kirstjen Nielsen, a top White House aide, to lead Homeland Security*, WASHINGTON POST (Dec. 5, 2017), https://www.washingtonpost.com/world/national-security/senate-confirms-kirstjen-nielsen-a-top-white-house-aide-to-lead-homeland-security/2017/12/05/65337056-d9fb-11e7-b859-fb0995360725_story.html?utm_term=.314bd7b928c7.

countries.  This evidence of the Administration's overt animus against Latino immigrants and other immigrants of color supports an inference that DHS's decision to terminate El Salvador's TPS designation was motivated by discrimination on the basis of race and national origin.  For example:

a.  On June 16, 2015, when announcing his presidential campaign, then-candidate Trump said: "When Mexico sends its people, they're not sending their best . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists . . . They're sending us not the right people. It's coming from more than Mexico. It's coming from all over South and Latin America . . . ."[95]

b.  On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole.  At the police station, they stated, "Donald Trump was right; all these illegals need to be deported." [96]  When asked about the incident, Trump failed to condemn the men, stating instead that they were "passionate." [97]  Specifically, Trump said "[i]t would be a shame . . . I will say that people who are following me are very passionate. They love this country and they want this country to be great again.  They are passionate."[98]

---

[95] Washington Post Staff, *Full text: Donald Trump announces a presidential bid*, WASHINGTON POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.963f83af6ca3.

[96] Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, BOSTON GLOBE (Aug. 21, 2015), https://www.bostonglobe.com/metro/2015/08/20/after-two-brothers-allegedly-beat-homeless-man-one-them-admiringly-quote-donald-trump-deporting-illegals/I4NXR3Dr7litLi2NB4f9TN/story.html.

[97] *Id.*

[98] *Id.*

c.  On May 25, 2016, in response to anti-Trump protestors in New Mexico, Trump tweeted that the protestors "were thugs who were flying the Mexican flag. The rally inside was big and beautiful, but outside, criminals!"[99]

d.  On June 2, 2016, then-candidate Trump told the *Wall Street Journal* that U.S. District Judge Curiel of the Southern District of California could not be fair in presiding over a lawsuit against Trump University because Judge Curiel was "of Mexican heritage," "Hispanic," and a member of a Latino Lawyers' association, which Trump characterized as being "very strongly pro-Mexican."[100]  Trump asserted that Judge Curiel's ancestry presented "an inherent conflict of interest" given Trump's campaign pledge to build a wall along the southern U.S. border.[101]  U.S. House Speaker Paul Ryan stated that he "disavow[ed] these comments," and explained that "[c]laiming a person can't do the job because of their race is sort of like the textbook definition of a racist comment.  I think that should be absolutely disavowed.  It's absolutely unacceptable."[102]

e.  On January 25, 2017, newly-inaugurated President Trump issued two Executive Orders: one that called for the immediate construction of a wall along the U.S.-Mexico border and another that ordered the withholding federal funds from sanctuary cities that limited their cooperation with federal immigration officials.  E.O. 13767

---

[99] Donald J. Trump (@realDonaldTrump), TWITTER (May 25, 2016, 6:39 AM), https://twitter.com/realdonaldtrump/status/735465352436408320.

[100] Tom Kertscher, *Donald Trump's racial comments about Hispanic judge in Trump University case*, politifact.com (June 8, 2016, 4:29 p.m.), http://www.politifact.com/wisconsin/article/2016/jun/08/donald-trumps-racial-comments-about-judge-trump-un/.

[101] *Id.*

[102] *Id.*

(border wall); E.O. 13768, sec. 9 (Jan. 25, 2017) (sanctuary cities).  When delivering a speech at DHS, President Trump cited Central American migration as a purported justification for both orders, and asserted that the country is "in the middle of a crisis on our southern border" and condemned a so-called "unprecedented surge" of migrants from Central America for eroding safety in the United States, claiming that these two orders "will save thousands of lives." [103]

f.  In June 2017, during an Oval Office meeting, President Trump said that immigrants from Haiti "all have AIDS" and that Nigerian immigrants, once they had seen the United States, would never "go back to their huts."  Officials who attended the meeting or were briefed about it by another participant attributed these words to President Trump.[104]

g.  On July 6, 2017, during a foreign policy speech delivered in Poland, President Trump expressed the need to protect "the West" and "civilization" against forces from "the South or the East" that threaten to undermine western "values," "courage," "spirit," and "will."[105]

h.  On January 11, 2018, President Trump met with lawmakers in the Oval Office to discuss a possible bipartisan immigration deal.  When discussing potential protections for immigrants from Haiti, El Salvador, and African countries, President Trump asked, "Why are we having all these people from shithole countries come here?"  He

---

[103]  President Trump Visits Homeland Security Department (Jan. 25, 2017),  https://www.c-span.org/video/?422704-1/president-trump-visits-homeland-security-department.
[104] Michael D. Shear and Julie Hirshfeld, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. TIMES  (Dec. 23, 2017),
https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.
[105] *Remarks by President Trump to the People of Poland*, whitehouse.gov (July 6, 2017),
https://www.whitehouse.gov/briefings-statements/remarks-president-trump-people-poland/.

then suggested that the United States should bring more people from countries such as Norway, which has an overwhelmingly white population.  Regarding Haitian immigrants, Trump asked "Why do we need more Haitians?" and said, "Take them out." [106]

67.    Indeed, courts have recognized disparaging remarks by the President as evidence of bias and animus.  For example:

a.    In upholding the District of Maryland's preliminary injunction of the third iteration of the Administration's "travel ban" applicable to immigrants from predominantly Muslim countries, the Fourth Circuit, sitting *en banc*, considered anti-Muslim comments and tweets by the President as "undisputed evidence of such bias."  *Int'l Refugee Assistance Project v. Trump*, Nos. 17-2231, 17-2232, 17-2233, 17-2240, 2018 U.S. App. LEXIS 3513, at *49 (4th Cir. Feb. 15, 2018) (en banc), *pet. for certiorari filed* (U.S. Feb. 23, 2018).  The Circuit cited, *inter alia*, a tweet in which the President "endorsed an apocryphal story involving General Pershing and a purported massacre of Muslims with bullets dipped in a pig's blood," and his re-tweeting of three anti-Muslim videos, "Muslim Destroys a Statue of Virgin Mary!"

---

[106] Josh Dawsey, "*Trump derides protections for immigrants from 'shithole' countries*, WASHINGTON POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.  There has been some disagreement among parties present at the meeting about what phrase President Trump used to refer to El Salvador and other countries; three White House officials are reported to have said that Senators Perdue and Cotton told the White House that they heard the President use "shithouse" instead of "shithole" as the adjective to describe these countries.  Josh Dawsey, Robert Costa, and Ashley Parker, *Inside the tense, profane White House meeting on immigration,* WASHINGTON POST (Jan. 15, 2018), https://www.washingtonpost.com/politics/inside-the-tense-profane-white-house-meeting-on-immigration/2018/01/15/13e79fa4-fa1e-11e7-8f66-2df0b94bb98a_story.html?utm_term=.e87aab635b62/.

"Islamist mob pushes teenage boy off roof and beats him to death!" and "Muslim

migrant beats up Dutch boy on crutches!" *Id*. at *55-56. The Circuit posited that "an

objective observer could conclude that the President's repeated statements convey the

primary purpose of the Proclamation —to exclude Muslims from the United States."

*Id*. at *56. *See also Washington v. Trump*, 847 F.3d 1151, 1167-68 (9th Cir. 2017)

(finding that the President's statements regarding a "Muslim ban" constituted "serious

allegations and presented significant constitutional questions"); *Hawai'i v. Trump*,

245 F. Supp. 3d 1227, 1236 (D. Haw. 2017) (considering the President's anti-Muslim

campaign statements in finding likelihood of success on the merits on Establishment

Clause claims); *Aziz v. Trump*, 234 F. Supp. 3d 724, 736 (E.D. Va. 2017) (same).

b. In denying the government's motion to dismiss a challenge to the rescission of the

DACA program, the Northern District of California found derogatory statements

directed to Latinos and Mexicans relevant to a showing of racial animus. *Regents of*

*the Univ. of Cal. v. Dep't of Homeland Security*, Nos. 17-5211, 17-5235, 17-5329,

17-5380, 17-5813, 2018 U.S. Dist. LEXIS 6141, at *32 (N.D. Cal. Jan. 12, 2018),

*appeal docketed* No. 18-15068, *UC Regents v. USDHS* (9th Cir. Jan. 17, 2018). The

district court cited: (i) the President's candidacy announcement in which "he

characterized Mexicans as criminals, rapists and 'people that have lots of problems'";

(ii) a subsequent tweet by the President "that '[d]ruggies, drug dealers, rapists and

killers are coming across the southern border,' and [rhetorical question] 'When will

the U.S. get smart and stop this travesty?'"; (iii) his claim during the first Republican

presidential debate that the Mexican government "'send[s] the bad ones over because

they don't want to pay for them'" and "refer[ence] to undocumented immigrants as

'animals' who are responsible for 'the drugs, the gangs, the cartels, the crisis of

smuggling and trafficking, MS13.'" *Id.* at *31-32 (citing complaint)

68.     Additionally, the President frequently relies on inflammatory rhetoric about MS-

13 gang members to inspire fear and support for its immigration policies.  For example:

a.  In December 2016, when responding to an article about deaths linked to MS-13 in

Long Island, New York, President Trump said: "They come from Central America.

They're tougher than any people you've ever met. . . They're killing and raping

everybody out there.  They're illegal.  And they are finished."[107]

b.  On April 18, 2017, President Trump tweeted: "The weak illegal immigration policies

of the Obama Admin. allowed bad MS 13 gangs to form in cities across U.S. We are

removing them fast!"[108]

c.  On September 5, 2017, Attorney General Sessions announced the rescission of the

Deferred Action for Childhood Arrivals ("DACA") program.  On the same day,

President Trump issued a written statement on that rescission that explicitly tied it to

his Administration's views on migrants from Central America: "The temporary

implementation of DACA . . . helped spur a humanitarian crisis – the massive surge

of unaccompanied minors from Central America including, in some cases, young

people who would become members of violent gangs throughout our country, such as

MS-13."[109]

---

[107] Michael Scherer, *2016 Person of the Year*, TIME, http://time.com/time-person-of-the-year-2016-donald-trump/.
[108] Donald J.Trump (@RealDonaldTrump), TWITTER, (April 18, 2017, 2:39AM), https://twitter.com/realdonaldtrump/status/854268119774367745?lang=en.
[109] *Statement from President Donald J. Trump*, whitehouse.gov (Sept. 5, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-7/.

d.   While campaigning for the presidency, President Trump frequently told a story about a snake that fatally bites a woman after she welcomes and cares for it.  He compared the duplicitous snake to refugees and other immigrants; thereby stoking xenophobic fearmongering.  He has continued this refrain while president, repeating the same snake story as recently as last month.[110]

## G.   Impact of Termination of TPS on Plaintiffs and Communities

69.    Jose Guevara is the forty-one year old father of twin 7 year-old daughters who are U.S. citizens. He supports them and his wife through his work in the construction field, in which he has been employed for the last five years.

70.    Mr. Guevara is active in his community; he is one of the leaders of a tenant association pressing the landlord to improve the living conditions in his apartment complex.

71.    Mr. Guevara fears for his daughters' future if he is forced to return to El Salvador with them because of their young age.  His daughters suffer from chronic asthma and regularly visit their doctor in Maryland to receive special treatment for this condition.  Mr. Guevara fears that because of El Salvador's poor health infrastructure, his daughters' health will be at risk.

72.    Juan Rodriguez is forty-eight years old and has lived in the United States for over twenty years, and though he is not a citizen, he feels American.  Over the years, he has supported his family with work in the construction field, which allowed him to purchase the home he has lived in since 2001.

---

[110] Eli Rosenberg, *'The Snake': How Trump appropriated a radical black singer's lyrics for immigration fearmongering*, WASHINGTON POST (Feb. 24, 2018), https://www.washingtonpost.com/news/politics/wp/2018/02/24/the-snake-how-trump-appropriated-a-radical-black-singers-lyrics-for-refugee-fearmongering/?utm_term=.65bec69d2cfa.

73.     Mr. Rodriguez is currently employed in the maintenance department of a non-profit organization that provides services to children and adults with autism and other severe disabilities.  He paints and repairs the homes of disabled individuals, contributing to their ability to live independently.  He has received accolades from his employer each of the five years he has worked there.

74.     Mr. Rodriquez fears a return to El Salvador will subject him to violence from gangs who seek extortion payments.  He knows from news reports that gangs target returnees from the United States because of their perceived relative wealth.  Because of the high unemployment in El Salvador, Mr. Rodriguez believes that his job options will be a day laborer or street vendor, possibly earning seven dollars a day.  Even at this amount, he believes he will be a target for gang extortion because they seek payments from almost everyone.

75.     Luis Andrade is forty-three years old and the father of two U.S. citizens, a 6 year-old kindergartener and an 11 year-old fifth-grader.  Both of his sons serve as altar boys in the church Mr. Andrade attends every Sunday.  To support his sons, he operates a licensed food truck, the license for which he will not be able to maintain with the termination of TPS.  Before operating the food truck, Mr. Andrade worked years in construction, including on projects in federal buildings, the Pentagon among them.

76.     Mr. Andrade's years of hard work allowed him to purchase a home and start the food truck business that supports his young boys.  If forced to return to El Salvador, Mr. Andrade does not know who he will be able to leave his children with. To him, a life for these U.S. citizens in El Salvador, where there is pervasive violence and they barely speak Spanish, is unthinkable.  To Mr. Andrade, the forced return to El Salvador means the loss of the ability to support his children given the high unemployment in El Salvador.

77.    Since the January 18, 2018 announcement terminating the TPS designation for El Salvador, CASA has had to reallocate significant resources to counsel and assist Salvadorans with protected status in understanding the impact of the termination and to help them navigate a vast set of necessary decisions and planning.

78.    To meet the needs of CASA members, CASA has refocused its legal work to assist protected Salvadorans by, *inter alia*:  providing financial counseling and developing plans for the transfer of assets; developing custody and guardianship plans for children in the event the parents are removed from the United States; and developing plans for the healthcare of dependents should the head of household be removed.  CASA's small legal and social services team has had to suspend significant work to provide this assistance, to the detriment of its ability to provide other important services.  In addition, members of CASA's community organizing department, as well as other CASA departments, have reprioritized their work to engage with the Salvadoran TPS community and provide education about the consequences of the TPS termination.

79.    The termination of El Salvador's TPS designation has had a significant negative impact on CASA's communities, as its members with protected status and their families face an uncertain future that may include loss of employment, loss of a business, loss of a home and potential permanent separation from their families.

## VI.    ASSIGNMENT OF ERRORS

80.    The Administration's anti-immigrant agenda, the President's disparaging statements, and defendants' failure to account for current disrupted living conditions in El Salvador that jeopardize safety and security show that racial, ethnic and national origin animus is

a motivating factor behind the termination of El Salvador's TPS designation in violation of the

Constitution, the INA and the Administrative Procedure Act.

### COUNT I – VIOLATION OF FIFTH AMENDMENT EQUAL PROTECTION

81.     The Equal Protection Clause as incorporated by the Fifth Amendment prohibits

the federal government from taking action for which discriminatory intent or purpose is a

motivating factor.  *E.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252,

265-66 (1977); *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir.

2016).

82.     Defendants' termination of El Salvador's TPS was motivated by the

Administration's discriminatory intent to remove Salvadorans with protected status because of

their Latino race, ethnicity and national origin.  The discriminatory intent is evidenced by, *inter

alia*, the President's contemporaneously calling El Salvador and other TPS-designated countries

"shithole countries," asking "Why are we having all these people from shithole countries come

here," suggesting that the United States should instead encourage immigrants from places like

Norway, whose population is overwhelmingly white; the President's repeated disparaging

statements directed at Latino immigrants; the Administration's anti-immigrant agenda that is

targeted at Latino and other non-white or non-Christian immigrants; and defendants' failure to

consider the conditions in El Salvador that continue to disrupt living conditions.

83.     The termination of El Salvador's TPS designation therefore violates the Fifth

Amendment's guarantee of equal protection.

### COUNT II – VIOLATION OF FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS

84.     At the "core" of the Fifth Amendment Due Process rights is "protection against

arbitrary action."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998); *accord id.* ("We have

emphasized time and again that '[t]he touchstone of due process is protection of the individual

against arbitrary action of government.'") (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558

(1974)).  Substantive due process protects against egregious federal action that "shocks the

conscience" and "offend[s] the community's sense of fair play and decency," *Rochin v.

California*, 342 U.S. 165, 172-73 (1952), and "conduct intended to injure in some way

unjustifiable by any government interest is the sort of official action most likely to rise to the

conscience-shocking level." *Cnty. of Sacramento*, 523 U.S. at 849 (citing *Daniels v. Williams*,

474 U.S. 327, 331 (1986)).

85.    Defendants' abuse of authority under the INA to advance the Administration's

discriminatory objective of removing Salvadorans with protected status because of their Latino

race, ethnicity and national origin both shocks the conscience and offends fundamental notions

of fair play and decency.

86.    The termination of El Salvador's TPS designation therefore violates Fifth

Amendment substantive due process principles.

## COUNT III – VIOLATION OF IMMIGRATION AND NATURALIZATION ACT

87.    The INA authorizes the Secretary to terminate a designation of TPS based on a

determination that the country no longer meets the conditions for designation that the Act

specifies.  8 U.S.C. § 1254a(b)(3)(B).  It does not authorize the Administration to use termination

of TPS as a means of removing persons whom it disfavors because of their race, ethnicity or

national origin.

88.    In terminating the TPS designation of El Salvador, Defendants abused their

authority under the INA by using it to carry out the Administration's discriminatory objective.

Specifically, defendants terminated El Salvador's TPS designation in order to remove immigrants on the basis of their Latino race and ethnicity and their origin from Central America.

89.     Defendants' termination of El Salvador's TPS designation based on racial, ethnic and national origin animus is outside the authority conferred by the INA and thus *ultra vires*. *See* 8 U.S.C. § 1254a(b)(3)(B).

### COUNT IV – VIOLATION OF ADMINISTRATIVE PROCEDURE ACT

90.     The Administrative Procedure Act authorizes the federal courts to hold unlawful and set aside agency action that is:  "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

91.     Defendants terminated El Salvador's TPS designation based on a discriminatory motive rather than the factors specified by the INA.

92.     The termination is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to constitutional right and power, and in excess of statutory authority.

93.     The termination is also arbitrary and capricious because defendants failed to conduct an objective assessment of the conditions in El Salvador, disregarded relevant and important evidence about the current conditions in the country despite being advised of their dire status by numerous parties, and issued a decision that is based largely on broad and conclusory assertions that are not grounded in fact.

94.     The termination is arbitrary and capricious for the additional reason that it failed to consider the reliance interests of the persons with protected status, including the individual

plaintiffs and members of CASA who have protected status. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016). The U.S. government engendered that reliance through previous extensions that recognized that continuing significant housing shortages, damaged infrastructure, weak economy, underemployment, poverty and violence preclude safe return to El Salvador. Salvadorans with protected status relied on the promise of TPS that they would be able to remain in the United States until conditions in El Salvador improved to ensure safety and security. The Administration broke that promise arbitrarily and capriciously.

## VII.   RELIEF REQUESTED

For the foregoing reasons, plaintiffs request that the Court:

a)  declare unlawful and set aside the January 18, 2018 termination of TPS for El Salvador;

b)  enjoin defendants from implementing or enforcing their decision to terminate El Salvador's designation as a TPS country;

c)  order that TPS be continued for all Salvadorans who had such status prior to the January 18, 2018 termination notice unless and until the Secretary provides a lawful basis to terminate, and in no event end earlier than the September 9, 2019 effective date set forth in the January 18, 2018 termination notice;

d)  direct defendants to pay plaintiffs' legal fees and other costs of suit; and

e)  provide such other relief as the Court may deem appropriate.

Respectfully submitted,

/s/ **Steven Schulman**
  (D. Md. 17144)
Stephanie A. Webster*
Caroline L. Wolverton*
Jillie B. Richards*
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.

Washington, D.C.  20036
Phone: (202) 887-4000
Fax: (202) 887-4288
sschulman@akingump.com

*Application for pro hac vice admission
forthcoming*

*Attorneys for Plaintiff CASA de Maryland, Inc.*


/s/ **Dennis A. Corkery**
Matthew K. Handley (D. Md. 18636)
Dennis A. Corkery (D. Md. 19076)
Tiffany S. Yang (D. Md. 20011)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, Suite 400
Washington, DC 20036
(202) 319-1000
matthew_handley@washlaw.org
dennis_corkery@washlaw.org
tiffany_yang@washlaw.org

/s/ **Nicholas C. Katz**
Nicholas C. Katz (pro hac vice forthcoming)
CASA DE MARYLAND, INC.
8151 15th Avenue
Hyattsville, MD 20783
(240) 491-5743
nkatz@wearecasa.org
tmccormick@wearecasa.org

*Attorneys for Plaintiffs Jose E. Guevara, Juan
Rodriguez, and Luis Andrade*


Dated: March 23, 2018