# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

CASA DE MARYLAND, INC., ET AL.,        *

     Plaintiffs,                      *

v.                                     Case No.: GJH-18-845

                                   *

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

                                   *

     Defendants.

                                   *

*    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

On March 1, 2001, after a devastating earthquake that killed 1,100 people and displaced another 1.3 million, the Bush Administration designated El Salvador for "Temporary Protected Status," (TPS), a status that permits eligible nationals living in the United States at the time of the designation to lawfully remain here and work for as long as the designation remains in place.[1] Since then, El Salvador has struggled to recover from this earthquake, enduring repeated natural disasters, persistent poverty, and low economic growth that have combined to prevent the country from fully rebuilding its infrastructure. Accordingly, El Salvador's protected status was extended eleven times between 2002 and 2016. It is estimated that 262,500 Salvadoran nationals are recipients of TPS residing in the United States.

In January 2018, the Secretary of Homeland Security announced that El Salvador's TPS designation would be terminated. In March 2018, Plaintiffs filed this lawsuit, alleging that the decision to terminate El Salvador's TPS was motivated not by a determination that the country no longer continues to meet the conditions for designation, but by President Donald Trump's

---

[1] Unless noted otherwise, the facts are taken from the Complaint, ECF No. 1, and assumed to be true.

anti-Latino immigrant animus. Plaintiffs assert claims pursuant to the Equal Protection Clause as

incorporated into the Fifth Amendment,[2] the Fifth Amendment's Due Process Clause, the

Immigration and Nationality Act (INA), and the Administrative Procedure Act (APA). ECF No.

1. Presently pending before the Court is Defendants' Motion to Dismiss, ECF No. 28. The Court

held a Motions Hearing on September 12, 2018. *See* ECF No. 40. For the following reasons,

Defendants' Motion to Dismiss is granted in part and denied in part.

## I.      BACKGROUND

### A.  The Immigration and Nationality Act

The Immigration and Nationality Act of 1990, 8 U.S.C. §§ 1101 to 1537 ("INA")

authorizes the Attorney General to designate a country for protected status if:

> **(A)** the Attorney General finds that there is an ongoing armed conflict within the state
> and, due to such conflict, requiring the return of aliens who are nationals of that state to
> that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> **(B)** the Attorney General finds that--
> > **(i)** there has been an earthquake, flood, drought, epidemic, or other environmental
> > disaster in the state resulting in a substantial, but temporary, disruption of living
> > conditions in the area affected,
> > **(ii)** the foreign state is unable, temporarily, to handle adequately the return to the
> > state of aliens who are nationals of the state, and
> > **(iii)** the foreign state officially has requested designation under this subparagraph;
> > or
>
> **(C)** the Attorney General finds that there exist extraordinary and temporary conditions in
> the foreign state that prevent aliens who are nationals of the state from returning to the
> state in safety, unless the Attorney General finds that permitting the aliens to remain
> temporarily in the United States is contrary to the national interest of the United States.

---

[2] Though the Equal Protection Clause of the Fourteenth Amendment applies only to the states, courts have
consistently applied similar substantive protections to the federal government through the Fifth Amendment. *See,
e.g., Obergefell v. Hodges*, 135 S.Ct. 2584, 2602-03 ("The Due Process Clause and the Equal Protection Clause are
connected in a profound way, though they set forth independent principles.").

8 U.S.C. § 1254a(b)(1)(A-C).[3] In 2003, Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. 6 U.S.C. § 557. When the Secretary designates a country for TPS, eligible nationals of the designated country and eligible individuals with no nationality who "last habitually resided" in the designated country may remain lawfully in the United States for the duration of the designation. 8 U.S.C. § 1254a(a)(1)(A). TPS also authorizes these individuals to engage in employment in the United States. *Id*. § 1254a(a)(1)(B). Only aliens who have been "continuously physically present in the United States since the effective date of the most recent designation" are eligible for TPS. *Id*. § 1254a(c)(1)(A)(i).

The Secretary may determine an initial period of designation ranging from six months to eighteen months, *id*. § 1254a(b)(2)(B), and may extend the designation for an additional period of six, twelve, or eighteen months, *id*. § 1254a(b)(3)(C). The Secretary may also terminate the designation if she determines that a foreign state "no longer continues to meet the conditions for designation." *Id*. § 1254a(b)(3)(B). To terminate a designation, the Secretary must publish notice in the Federal Register, "including the basis for the determination." *Id*. The INA also contains a jurisdiction-stripping provision, stating "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation of a foreign state under this subsection." *Id*. § 1254a(B)(5)(A). Nonetheless, the INA provides for "an administrative procedure for the review of the denial of benefits." *Id*. § 1254a(B)(5)(B).

---

[3] The Court recognizes that "many consider 'using the term 'alien' to refer to other human beings' to be 'offensive and demeaning.' [The Court uses] the term 'only where necessary to be consistent with the statutory language' that Congress has chosen and 'to avoid any confusion in replacing a legal term of art with a more appropriate term.'" *See Trump v. Hawaii*, 138 S.Ct. 2392, 2443 n.7 (2018) (Sotomayor, J., dissenting) (quoting *Flores v. United States Citizenship & Immigration Servs.*, 718 F.3d 548, 551-52 n. 1 (6th Cir. 2013)).

## B. Designation and Termination of El Salvador for TPS

On January 13, 2001, a 7.6 magnitude earthquake struck El Salvador, leaving 1,100 dead, around 2,500 missing, and approximately 8,000 injured. ECF No. 1 at ¶ 23.[4] The earthquake displaced an estimated 1.3 million people, caused nearly $3 billion in damages, and damaged or destroyed over 200,000 homes and public buildings. *Id.* The administration of President George W. Bush designated El Salvador for TPS and announced that Salvadorans who had been residing in the United States since February 13, 2001 would be eligible to apply for protected status. *Id.* ¶ 24. The notice of designation was published in the Federal Register on March 9, 2001. 66 Fed. Reg. 14214.

Between 2002 and 2016, El Salvador's protected status was extended eleven times. ECF No. 1 at ¶ 25. Each of these extensions detailed considerable ongoing structural and social problems in El Salvador. *Id.* In 2002, more than 75% of road infrastructure needed rebuilding; by 2005, only one-third of the houses destroyed or damaged had been rebuilt or were under construction, and 240 schools needed rebuilding; in 2007, only fifty percent of the homes had been repaired, and only two of the seven main hospitals were undergoing reconstruction; in 2010, still just fifty percent of the homes had been repaired, and the country was reeling from a tropical storm and a volcanic eruption in 2005, a series of earthquakes in 2006, and a hurricane in 2009; by 2015, El Salvador still faced a housing deficit of 446,000, "a profound deficit for a country of 6.1 million people." *Id.*

The final extension came on July 8, 2016. *Id.* ¶ 26. That extension was due to expire on March 9, 2018. *Id.* The Secretary reported that the housing deficit had risen to 630,000, a regional drought was contributing to food insecurity, a lack of potable water affected ten percent

---

[4] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

of the population, and one third of the population was underemployed or unable to find full-time work. *Id*. Since then, conditions have worsened in some ways, as a 7.0 magnitude earthquake struck the country in November 2016, and a 5.1 magnitude earthquake struck in April 2017. *Id*. ¶ 30. The housing shortage, though down to 360,000 homes, still affects nearly one million families. *Id*. ¶ 32. The labor market is in similarly bad shape, as one-third of the country's urban labor force remains underemployed. *Id*. ¶ 34. Forty percent of Salvadoran households live in poverty or extreme poverty. *Id*. In 2016, remittances sent from Salvadoran nationals living abroad were the country's single greatest source of income, 97% of which come from relatives residing in the United States. *Id*. ¶ 35. And the rate of these remittances is only increasing. *Id*. Furthermore, crime continues to plague the country, as El Salvador has one of the highest murder rates in the world. *Id*. ¶ 38. In 2016 alone, nearly 220,000 people were forced to flee violence in El Salvador. *Id*. ¶ 46.

Nonetheless, on January 8, 2018, the Secretary announced that El Salvador's TPS designation would be terminated. *Id*. ¶ 28. The notice of termination published in the Federal Register states that the termination will be effective on September 9, 2019. 83 Fed. Reg. 2654. According to the Complaint, this termination came after White House Chief of Staff John Kelly pressured acting DHS Secretary Elaine Duke to terminate the TPS designation of Honduras, another Central American country, explaining that continuing the designation would frustrate the Administration's immigration policy. ECF No. 1 at ¶ 65. Just days later, the Department of State issued a travel advisory warning that violent crime and gang activity in El Salvador is "widespread" and "common" and "local police may lack the resources to respond effectively to serious criminal incidents." *Id*. ¶ 62.

### C.  President Donald J. Trump's Statements About Latino Immigrants

The Complaint details a lengthy list of disparaging statements and actions made by President Donald Trump regarding Latino immigrants. ECF No. 1 at ¶ 66. An incomplete selection is provided here. This pattern began during the announcement of his presidential campaign, when he said, "When Mexico sends its people, they're not sending their best . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists . . .It's coming from more than Mexico. It's coming from all over South and Latin America . . ." *Id*. at ¶ 66a. Months later, Trump refused to condemn two of his supporters who "urinated on a sleeping Latino man and beat him with a metal pole," instead saying only that they were "passionate." *Id*. at ¶ 66b. During the campaign, Trump told the *Wall Street Journal* that U.S. District Judge Gonzalo P. Curiel of the Southern District of California could not be fair in presiding over a lawsuit against Trump University because Judge Curiel was "of Mexican heritage," "Hispanic," and a member of a Latino Lawyers' Association. *Id*. at ¶ 66d.

After his election and inauguration, it is alleged that these statements continued. During a speech delivered in Poland, President Trump expressed the need to protect "the West" and "civilization" against forces from "the South or the East." *Id*. at ¶ 66g. Later, when discussing potential protections for immigrants from El Salvador (as well as immigrants from Haiti and a group of African countries), President Trump allegedly asked, "Why are we having all these people from shithole countries come here?" *Id*. at ¶ 66h. He then suggested the United States should focus on immigration from countries such as Norway—which has a predominantly white population—instead. *Id*.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(1)

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal

Rules of Civil Procedure, arguing that 8 U.S.C. § 1254a(b)(5)(A) strips the Court of jurisdiction

over Plaintiffs' claims. ECF No. 28 at 14. A plaintiff "has the burden of proving that subject

matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). On a

motion to dismiss for lack of subject matter jurisdiction, a Court may grant the motion "only if

the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a

matter of law." *Id*. The Court must "regard the pleadings as mere evidence on the issue, and may

consider evidence outside the pleadings without converting the proceeding to one for summary

judgment." *Id*. (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d

765, 768 (4th Cir. 1991).

### B.  Rule 12(b)(6)

Defendants also move to dismiss the Complaint pursuant to Rule 12(b)(6), asserting that

Plaintiffs fail to state a claim upon which relief can be granted. On a motion to dismiss for failure

to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must accept the factual

allegations of the complaint as true and construe them in the light most favorable to the

nonmoving party." *Rockville Cars, LLC v. City of Rockville, Md.*, 891 F.3d 141, 145 (4th Cir.

2018). To overcome a 12(b)(6) motion, the "complaint must contain sufficient factual matter,

accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs

must "provide sufficient detail" to show "a more-than-conceivable chance of success on the

merits." *Upstate Forever v. Kinder Morgan Energy Partners*, 887 F.3d 637, 645 (4th Cir. 2018)

(citing *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014)). The mere recitation of "elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). A plausibility determination is a "context-specific inquiry" that relies on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679-80.

## III.    DISCUSSION

Plaintiffs are three Salvadoran nationals who have been TPS beneficiaries since 2001[5] and CASA de Maryland, Inc. ("CASA"), a non-profit organization whose mission is to "create a more just society by building power and improving the quality of life in low-income immigrant communities." ECF No. 1 at ¶¶ 9-12. They bring two constitutional claims and two statutory claims against President Trump, the U.S. Department of Homeland Security ("DHS"), and Secretary of Homeland Security Kirstjen M. Nielsen (the "Secretary").

Plaintiffs first allege that the termination of El Salvador's TPS was motivated by discriminatory intent in violation of the Equal Protection Clause as incorporated by the Fifth Amendment. *Id*. at ¶ 81. Next, they allege that, because the termination was motivated by discriminatory intent, it also violates the substantive protection against arbitrary action found in the Due Process Clause of the Fifth Amendment. *Id*. at ¶ 84. Third, Plaintiffs argue that, because the INA does not authorize the Administration to terminate a country's TPS designation on the basis of disfavoring the race of persons protected under the statute, the Administration's action is *ultra vires* and violates the INA. *Id*. at ¶ 89. Finally, Plaintiffs argue that the discriminatory basis of the Administration's action violates 5 U.S.C. § 706(2) of the Administrative Procedure Act ("APA"). *Id*. at ¶ 90. But before the Court can consider these arguments, it must determine whether § 1254a(b)(5)(A) strips the Court of subject-matter jurisdiction over some, or all, of

---

[5] Individual named Plaintiffs are: Jose E. Guevara, Juan Rodriguez, and Luis Andrade.

these claims. The Court must also determine whether separation of powers concerns should lead the Court to dismiss the President of the United States as a defendant.

## A. Subject-Matter Jurisdiction

As an initial matter, the court must determine whether § 1254a(b)(5)(A) of the TPS statute bars Plaintiffs' constitutional, APA, and/or INA claims. The statute reads: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Plaintiffs contend that this jurisdiction-stripping statute does not apply to actions that are challenged as unconstitutional or are based on considerations outside of the agency's statutory authority. ECF No. 33 at 10.

A federal court must have subject-matter jurisdiction to decide a matter before it. *Lightfoot v. Cendant Mortg. Corp.*, 137 S.Ct. 553, 562 (2017). If it does not, then the court must dismiss the case. Fed. R. Civ. P. 12(b)(1). Congress may limit the subject-matter jurisdiction of the federal courts. *See, e.g., Sheldon v. Sill*, 49 U.S. 441, 449 (1850) ("And it would seem to follow, also, that, having a right to prescribe, Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies."). But when interpreting a statute in which Congress seeks to limit judicial review, courts must "begin with the strong presumption that Congress intends judicial review of administrative action." *Berkley v. Mountain Valley Pipeline*, 896 F.3d 624, 631 (4th Cir. 2018) (quoting *Bowen v. Mich. Acad. Of Family Physicians*, 476 U.S. 667, 670 (1986)). This presumption can be overcome "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967). Clear and convincing evidence of contrary intent can be established by "specific language, specific legislative history, and inferences of intent drawn from the statutory

scheme as a whole that Congress intended to bar review." *Cuozzo Speed Techs., LLC v. Lee*, 136 S.Ct. 2131, 2140 (2016) (quotations omitted).

The presumption in favor of judicial review is particularly important in regards to constitutional claims. *Webster v. Doe*, 486 U.S. 592, 603 (1988) ("We require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.") (quoting *Bowen*, 476 U.S. at 681 n.12). Defendants' burden to overcome this presumption is a "heavy" one, *Mach Mining, LLC v. EEOC*, 135 S.Ct. 1645, 1651 (2015), because it is expected that when Congress intends to bar judicial review altogether, it employs "unambiguous" and "comprehensive" language, *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 780 (1985).

Courts have consistently construed jurisdiction-stripping provisions narrowly. For instance, in *McNary v. Haitian Refugee Center*, the Supreme Court considered whether Section 210(e)(1) of the INA barred statutory and constitutional challenges to an application review process for a farmworker amnesty program alleged to have been conducted by the Immigration and Naturalization Service ("INS") in an arbitrary manner. 498 U.S. 479, 491-94 (1991). The plaintiffs alleged that the INS procedures for conducting the review process did not allow applicants to be apprised of or to be given opportunities to challenge adverse evidence, did not allow applicants to present witnesses on their own behalf, and that competent interpreters were not provided for those who did not speak English. *Id*. at 487-88. Defendants argued that the claim was precluded by Section 210(e)(1), which states, "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection." 8 U.S.C.A. § 1160(e)(1).

The Court held that Section 210(e)(1) did not preclude the federal district court from hearing the claims. *McNary*, 498 U.S. at 479. The Court explained that "the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id*. at 492. Therefore, while an individual challenge to a determination of eligibility for the farmworker amnesty program is barred, a "general collateral challenge[] to unconstitutional practices and policies" is not. *Id*.

Furthermore, the Court explained that limiting review of the issues raised to individual deportation proceedings would mean the plaintiffs could "ensure themselves review in courts of appeals only if they voluntarily surrender themselves for deportation. Quite obviously, that price is tantamount to a complete denial of judicial review for most undocumented aliens." *Id*. at 496-97. Therefore, the Court concluded that Section 210(e)(1) bars only review of denials of individual determinations. *Id* at 497-98; *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 54-56 (1993) (allowing plaintiff's challenge to regulations interpreting the Immigration Reform and Control Act despite statute stating, "There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subjection") (quoting 8 U.S.C.A. §1255a(f)(1)); *Bowen*, 476 U.S. at 679-80 (holding that section of the Social Security Act stating that "[n]o findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided" and "[n]o action . . . shall be brought . . . to recover on any claim arising under this subchapter" did not bar judicial review of the validity of a regulation governing the payment of Medicare benefits); *Lindahl*, 470 U.S. at 791 (holding that § 8347(c) of the Civil Service Reform Act only barred judicial review of factual determinations relating to OPM's denial of disability retirement claims, but not review of any "substantial departure from important procedural rights,

a misconstruction of the governing legislation, or some like error 'going to the heart of the administrative determination'").

In contrast, courts have enforced jurisdiction-stripping provisions where a plaintiff seeks to challenge the merits of an agency's justification for an action that is squarely covered by the provision, particularly where other judicial recourse remains available. In *Lee v. USCIS*, 592 F.3d 612, 613(4th Cir. 2010), a Korean national overstayed his visa and applied to become a permanent resident under 8 U.S.C. § 1255(i), an INA provision that permitted otherwise ineligible foreign nationals to apply for an adjustment of status. But the provision had already expired, except for those "grandfathered" in. *Id*. U.S. Citizenship and Immigration Services ("USCIS") denied the application, concluding he did not qualify as grandfathered, and the plaintiff filed suit in federal district court to challenge that conclusion. The INA, at 8 U.S.C. § 1252(a)(2)(B), states that:

> Notwithstanding any other provision of law (statutory or nonstatutory), ... except as provided in sub paragraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision ... specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

The court recognized that plaintiff's action was an allegation that USCIS "made a faulty eligibility determination" pursuant to § 1255. *USCIS*, 592 F.3d at 620. The plaintiff's bare claim that he was raising a pure question of law was insufficient for the district court to take jurisdiction because his claim for relief directly challenged "the sole basis for the denial" of the application. *Id*. Furthermore, the court explained that the INA provided for these claims to be

heard on appeal to the Board of Immigration Appeals, and then subsequently on appeal to a circuit court of appeal. *Id.* at 618. Therefore, such a straightforward challenge to a grant of relief under § 1255 was barred by § 1252(a)(2)(B)(i). *Id.* at 621.

The Supreme Court's reasoning in *Cuozzo* is similarly helpful. There, the Court considered whether a provision of the Leahy-Smith America Invents Act barred judicial review of the Patent Office's determination to institute an inter partes review of a previously allowed patent claim. *Id.* at 2137. That provision states that "[t]he determination by the Director [of the Patent Office] whether to institute an inter partes review under this section shall be final and nonappealable." 35 U.S.C.A. § 314(d). After emphasizing the seemingly conclusive nature of the phrase "final and nonappealable," the Court proceeded to note that the plaintiff was challenging the merits of the Director's decision. *Cuozzo*, 136 S.Ct. at 2139. To allow such a challenge would have undermined Congress' decision to give the Patent Office "significant power to revisit and revise earlier patent grants." *Id.* at 2139-40. The Court thus emphasized that this interpretation of the statute maintained "the agency's primacy over its core statutory function in accord with Congress' intent." *Id.* at 2141. Therefore, the Court determined that the "strong presumption" in favor of judicial review was overcome by this specific language and inferences from the statutory scheme. *Id.* at 2140-41.

Even still, the Court stressed that its holding did not constitute an absolute bar on judicial review. The Court explicitly excluded appeals that implicate constitutional questions, that implicate due process problems, or that allege an agency has acted outside its statutory limits, noting that the Administrative Procedure Act allows courts to "'set aside agency action' that is 'contrary to constitutional right,' 'in excess of statutory jurisdiction,' or 'arbitrary [and] capricious.'" *Id.* at 2141-42; *see also Mironescu v. Costner*, 480 F.3d 664, 674 (4th Cir. 2007)

(holding that district court was precluded from considering a challenge to the merits of an individual foreign national's extradition where the statute required such claims to be heard only as part of the review of a final order of removal); *Krua v. Dep't of Homeland Security*, 729 F. Supp. 2d 452, 455 (D. Mass. 2010) (barring naked challenge to the grant of TPS protection only to Liberians who continuously resided in the United States since 2002).

Turning to the matter at hand, there are three reasons why the language here does not support the conclusion that Congress intended § 1254a(b)(5)(A) to bar the court's consideration of Plaintiff's constitutional or APA claims. First, the text does not use the unambiguous and comprehensive language used in statutes courts have interpreted as broadly precluding judicial review. Second, the statutory scheme does not demand preclusion of the types of claims brought by Plaintiffs. Third, just as in *McNary*, the alternative methods of review of Plaintiffs' claims offered by the Department do not constitute meaningful review.

First, the statute states that "[t]here is no judicial review of any determination" of the Secretary. This language closely resembles the language found in *McNary* and *Reno* not to constitute an absolute bar on judicial review, but instead to bar review of the merits of an individual determination. *See* 8 U.S.C.A. § 1160(e)(1) ("There shall be no administrative or judicial review of a determination…"); 8 U.S.C.A. § 1255a(f)(1) ("There shall be no administrative or judicial review of a determination…"). In contrast, the jurisdiction-stripping provision in *USCIS* states that "no court shall have jurisdiction to review . . . any judgment . . . or any other decision," "[n]otwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(B). By stating that it applied both to judgments under certain sections of the statute as well as any other decision, and by further specifying that this provision applied

notwithstanding *any* other provision of law, the statute portrays far broader and comprehensive coverage than the provision here.

Additionally, unlike certain other statutes, § 1254a does not address constitutional challenges. *See* 8 U.S.C. § 1252(b)(9) ("Judicial review of *all questions of law and fact, including interpretation and application of constitutional and statutory provisions*, arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order under this section." (emphasis added)) *and* 38 U.S.C. § 511(a) (another statute in the INA giving the Secretary authority to decide "*all questions of law and fact*" and making such decisions "final and conclusive," not to be "reviewed by any other official or by any court" (emphasis added)). Just as in *McNary*, this statute is best read as barring judicial review of the merits of the determination itself, but not whether the determination was made through "unconstitutional practices and policies." 498 U.S. at 492.

Second, Plaintiffs' constitutional and APA claims do not threaten the "agency's primacy over its core statutory function." In *USCIS*, to allow the plaintiff's claims would have permitted judicial review of the merits of every allegedly faulty eligibility determination by a USCIS District Director—precisely the outcome Congress sought to prevent. 592 F.3d at 620. In *Cuozzo*, the plaintiffs' claims would have similarly exposed the Patent Office to unrestricted litigation challenging the Patent Office's power to revisit and revise earlier patent grants. 136 S.Ct. at 2139-40. But to allow Plaintiffs' constitutional and APA claims here will not similarly permit challenges to the merits of every determination made by the Secretary. To permit judicial review of a claim that the Secretary's process was infected by unconstitutional discriminatory intent does not undermine the Secretary's general authority to make a determination of the merits of a country's eligibility for TPS. While it is true that Plaintiffs allege that the Secretary's

decision is not backed by actual improved conditions in El Salvador, *see* ECF No. 1 at ¶¶ 29-55, these facts are relevant only as circumstantial evidence of a showing of discriminatory intent or a process the Secretary abandoned without proper explanation on the record. *See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency may not "depart from a prior policy *sub silentio*").

Third, Defendants' argument that removal proceedings pursuant to Section 1254a(b)(5)(B) offer a forum for Plaintiffs' constitutional claims is not persuasive. To pursue these claims, individual plaintiffs would have to lose their protected status and then wait until they face removal before they may bring claims. Such a choice is "tantamount to a complete denial of judicial review." *McNary*, 498 U.S. at 496-97 (rejecting the same argument). *McNary* plainly forecloses this option. Furthermore, the Board of Immigration Appeals is powerless to address fundamental constitutional claims. *See, e.g.*, *Hadayat v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006). And CASA de Maryland cannot be subject to removal proceedings, so federal court is the only forum available for it to pursue its constitutional claims.

Thus, the Court holds that § 1254a(b)(5)(A) does not bar review of Plaintiffs' Equal Protection, Substantive Due Process, or Administrative Procedure Act claims. *See also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1101-08 (N.D. Cal. 2018) (holding § 1254a(b)(5)(A) does not strip court of jurisdiction to consider general collateral practices or colorable constitutional claims); *Centro Presente v. Dep't of Homeland Security*, 2018 WL 3543535 at *10 (D. Mass.

2018) (holding §1254a(b)(5)(A) does not strip court of jurisdiction to consider equal protection, substantive due process, and APA claims).

Plaintiffs' claim that the Secretary's determination violates the INA, ECF No. 1 ¶¶ 87-89, fares differently. To evaluate the plausibility of Plaintiffs' constitutional and APA claims, the Court need only determine whether a reasonable factfinder could determine that discriminatory intent infected the Secretary's process for terminating El Salvador's TPS. But the Secretary's actions are not, as Plaintiffs' suggest, *ultra vires* if her decision to terminate El Salvador's TPS was appropriately based on statutory factors. Plaintiffs' claims that the decision violated the INA would thus necessarily force the Court to evaluate the sufficiency of the Secretary's determination.[6] The text of § 1254a(b)(5)(A) bars judicial review of precisely this kind of determination. The primacy of the Secretary's authority to designate country's for TPS precludes the Court from probing the sufficiency of the Secretary's determinations. Therefore, review of Plaintiffs' INA claim is unreviewable and must be dismissed.

### B. Equal Protection Clause

Plaintiffs contend that the termination of TPS for El Salvador violates the Equal Protection Clause as incorporated by the Fifth Amendment because discriminatory intent or purpose on the basis of race is a motivating factor. *See Arlington Heights*, 429 U.S. at 265-66. Defendants counter with two main arguments: first, that *Hawaii v. Trump*, 138 S.Ct. 2392, 2418-19 (2018), and not *Arlington Heights*, 429 U.S. at 265-66, controls this case; and second, that,

---

[6] Additionally, as Defendants argue, to adopt Plaintiff's argument here would allow any potential plaintiff to claim an act was *ultra vires* anytime they are unhappy with a result by claiming the wrong factors were considered. To the extent Plaintiffs claim that Defendants considered factors that violated the Constitution, those assertions are best addressed as part of their Constitutional claims.

even if *Arlington Heights* applies, Plaintiffs have not established that discriminatory animus was a motivating factor in the decision.[7] The Court will address both arguments.

### 1. Level of Deference

Defendants contend that *Trump v. Hawaii* provides the appropriate analysis. There, the plaintiffs brought an Establishment Clause challenge to an Executive Order that placed entry restrictions on the nationals of eight foreign states, alleging that the primary purpose of the Order was to discriminate against Muslims. *Id*. at 2403. On an appeal from the grant of a preliminary injunction, the Supreme Court held that rational-basis review would be applied to the Establishment Clause claim, as it concerned the entry of foreign nationals. *Id*. at 2420. The Court emphasized that the claim sought to "invalidate a national security directive regulating the entry of aliens abroad." *Id*. at 2418. Explaining that "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised . . . largely immune from judicial control,'" the Court determined that it should not interfere with "relations with foreign powers" or "classifications defined in the light of changing political and economic circumstances." *Id*. (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) *and Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

Plaintiffs counter that *Arlington Heights* provides the proper analysis. There, the plaintiffs argued that local zoning restrictions were motivated, at least in part, by racial discrimination. 429 U.S. at 265-66. The Supreme Court explained that even though courts properly refrain from analyzing the merits of legislative or administrative action, "[w]hen there is

---

[7] Defendants very briefly argue that the lack of identified comparators should defeat the equal protection claim, citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). But neither *Arlington Heights* nor subsequent Fourth Circuit precedent restricts the Court from considering direct evidence of discriminatory intent. *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (courts should consider "[t]he specific sequence of events leading up to the challenged decision" and "[d]epartures from normal procedural sequence" in addition to whether the impact of the official action bears more heavily on one race than another") (quoting *Arlington Heights*, 429 U.S. at 266-67); *see also Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (overt animus obviated the need to present a similarly situated individual who was treated differently).

a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Id*. at 265-66.

For two key reasons, *Hawaii* does not apply to this case. First, *Hawaii* dealt with aliens seeking admission to the United States for the first time, while this case deals with residents who have lived in the United States for years and have established deep connections—some of them familial—to this country. *See, e.g.,* ECF No. 1 ¶¶ 69-76. Courts have long established that, "[s]ince an alien obviously brings with him no constitutional rights, Congress may exclude him in the first instance for whatever reason it sees fit." *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring); *see also Turner v. Williams*, 194 U.S. 279, 290 (1904) ("the bringing of persons into the ports of the United States . . . is not open to constitutional objection"). "But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Bridges*, 326 U.S. at 161-62). Commensurate with this legal residence is a "generous and ascending scale of rights as [the alien] increases his identity with our society." *Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly").

Repeatedly, courts have applied this principle to ensure that lawfully present aliens are not subject to removal processes that violate the Constitution.[8] *See, e.g., Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."); *Haitian Refugee Ctr., Inc.*

---

[8] Defendants' suggestion that claims challenging the constitutionality of removal of legally present aliens should be accorded rational-basis review thus threatens this entire body of law. This Court does not read *Hawaii* so expansively.

*v. Nelson*, 872 F.2d 1555, 1563 (11th Cir. 1989) (holding that aliens applying for protections under the Special Agricultural Worker program had a property interest that was accorded procedural due process protection).

That these cases apply the Due Process Clause rather than the Equal Protection Clause is of no matter; "each aspect of the Fourteenth Amendment reflects an elementary limitation on state power," and both clauses thus apply with equal weight to resident aliens. *Plyler v. Doe*, 457 U.S. 202, 213 (1982) ("There is simply no support for appellants' suggestion that 'due process' is somehow of greater stature than 'equal protection[.]'"); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). Nowhere in this body of law is it suggested that judicial review of the constitutionality of removal proceedings of resident aliens is subject to a blanket of rational-basis review. *See Haitian Refugee Ctr.*, 872 F.2d at 1562-63 (affirming preliminary injunction where INS procedures for evaluating aliens' applications for a Special Agricultural Workers program violated the Due Process Clause without applying rational-basis review); *see also Plyler*, 457 U.S. at 216 (applying heightened scrutiny to an Equal Protection challenge to a state's denial of free public education to the children of illegally present aliens).

Second, none of the national security or foreign policy concerns implicated in *Hawaii* are present here. There, the Executive Order at issue was facially designed "to diminish the risk that dangerous individuals would enter without adequate vetting from . . . state sponsor[s] of terrorism," states significantly compromised by terrorist organizations, or active conflict zones. *Hawaii*, 138 S.Ct. at 2404. The Court emphasized "the lack of competence on the part of the courts" in "collecting evidence and drawing inferences" on questions of national security. *Id.* at 2419 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)). Defendants do not dispute that the termination of TPS for El Salvador does not implicate any of these, or similar

concerns; rather, they contend that these concerns do not underlie the Court's decision in *Hawaii See* ECF No. 36 at 9-10.

*Hawaii* relies on a line of cases applying rational-basis review to immigration decisions that involved the admission of aliens, but not national security implications, *see Fiallo v. Bell*, 430 U.S. 787, 795 (1977) (deferring to congressional judgment to prefer admission of illegitimate children seeking preference by virtue of relationship with citizen mothers, but not citizen fathers); *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (deferring to Executive denial of admission of a Belgian journalist who subsequently challenged the denial on the basis of the First Amendment); involved the removal of aliens, due to national security concerns, who were already present, *see Rajah v. Mukasey*, 544 F.3d 427, 433 (2d Cir. 2008) (upholding deportation of illegally present aliens identified by the National Security Entry-Exit Registration System); or involved *both* the admission of aliens and national security concerns, *see Kerry v. Din*, 135 S.Ct. 2128, 2140 (2015) (deferring to Executive's refusal to issue a visa for admission to husband of a U.S. Citizen who was a former civil servant in the Taliban); *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489, 491 (1999) (hereinafter *AADC*) (rejecting the First Amendment claims of a group of undocumented residents who were allegedly targeted for deportation because they were members of a government-designated terrorist organization and selective-enforcement is the province of the Executive). Defendants do not cite to, and the Court is not aware of, a case applying a rational-basis standard of review to plausible allegations of invidious discrimination against legally present aliens who are not alleged to pose a threat to national security.

Defendants also contend that a series of other cases involving immigration classifications establishes that rational-basis is the proper standard of review. *See Malik v. Gonzales*, 213 F.

App'x 173, 174 (4th Cir. 2007); *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981);

*Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979). *Malik* provides no help here—it makes

no statement regarding the standard of review used to determine that a foreign national's

registration for the National Security Entry–Exit Registration System did not violate the Equal

Protection Clause and, as in *Rajah*, involves national security concerns. *Malik*, 213 F. App'x at

174. In two other immigration cases cited by Defendants, courts have stated the longheld rule

that "when the government classifies aliens on the basis of nationality, the classification must be

upheld if it has a rational basis." *Malek-Marzban*, 653 F.2d at 116; *Narenji*, 617 F.2d at 748. But

Plaintiffs do not merely suggest that the Secretary classified on the basis of nationality; Plaintiffs

contend that the Secretary's decision was infected by discriminatory intent on the basis of race,

color, and ethnicity. ECF No. 1. ¶ 82. In the immigration context, a government's classifications

on the basis of nationality are sensibly reviewed deferentially, as nearly all immigration policies

involve some degree of classification on the basis of nationality. *See generally Plyler*, 457 U.S.

at 216 ("A legislature must have substantial latitude to establish classifications that roughly

approximate the nature of the problem perceived, that accommodate competing concerns both

public and private, and that account for limitations on the practical ability of the State to remedy

every ill."). But that rationale does not justify, as Plaintiffs allege, the government's

discrimination in this case on the basis of race or color, which are distinct from individual

Plaintiffs' national origin. Therefore, the Court holds that the analysis outlined in *Arlington

Heights* controls. *See also Ramos v. Nielsen*, 321 F. Supp. 3d at 1127 (rejecting rational-basis

review of equal protection challenge to TPS terminations of Haiti, Sudan, Nicaragua, and El

Salvador); *Centro Presente*, 2018 WL 3543535 at *14-15 (holding the *Arlington Heights*

standard applies to TPS terminations of Haiti, El Salvador, and Honduras, and that claims would

nonetheless survive rational-basis review)

2. Plaintiffs Plausibly Allege Sufficient Facts to Establish a Violation of the Equal Protection Clause

The government violates the Equal Protection Clause when a "facially neutral" state

action is motivated by "invidious racial discrimination." *McCrory*, 831 F.3d at 220. Facially

neutral action that is motivated by racial discrimination is "just as abhorrent, and just as

unconstitutional, as [action] that expressly discriminate[s] on the basis of race." *Id*. Under

*Arlington Heights*, Plaintiffs need not show that the discriminatory purpose is the "'sole' or even

a 'primary' motive for the [action], just that it was '*a* motivating factor'" *Id*. (quoting *Arlington

Heights*, 429 U.S. at 265-66 (emphasis added by the Fourth Circuit)). To determine whether a

facially neutral action is motivated by racial discrimination, a court should consider the

following nonexhaustive factors: "'[t]he historical background of the [challenged] decision';

'[t]he specific sequence of events leading up to the challenged decision'; '[d]epartures from

normal procedural sequence;'" and the public statements made in support of the action. *Id.*

(quoting *Arlington Heights*, 429 U.S. at 266-67.) An action is not cured of discriminatory taint

because it is taken by an unprejudiced decision-maker who is manipulated or controlled by

another who is motivated by discriminatory intent. *See Staub v. Proctor Hospital*, 562 U.S. 411,

413 (2011). "Once racial discrimination is shown to have been a 'substantial' or 'motivating'

factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that

the law would have been enacted without this factor." *Id*. at 221 (quoting *Hunter v. Underwood*,

471 U.S. 222, 228 (1985)).

Defendants do not suggest that President Trump's alleged statements are not evidence of discriminatory motive on his part, nor could they. One could hardly find more direct evidence of discriminatory intent towards Latino immigrants. He has broadly painted Latino immigrants as drug-users, criminals, and rapists. ECF No. 1 ¶ 66a. He spoke publicly about the need to protect "the West" and "civilization" from forces from "the South or the East." *Id.* ¶ 66g. And, just three days after the Secretary announced the termination of TPS for El Salvador, the President allegedly called El Salvador and Haiti (another TPS-designated country) a "shithole" country and expressed a preference for immigrants from overwhelmingly white countries like Norway. *Id.* ¶ 66h. These final statements, in particular, are "contemporary statements" by the President of the United States, who is alleged to have been involved in the decision to terminate TPS for El Salvador. *Arlington Heights*, 429 U.S. at 268. "[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010) (internal quotation marks and alterations omitted). The alleged termination of El Salvador's TPS on the basis of these beliefs is impermissible under the Equal Protection Clause. *See also Ríos-Colón v. Toledo-Dávila*, 641 F.3d 1, 5 (1st Cir. 2011) (allegations that a supervisor who used "abusive and derogatory slurs expressing explicit anti-black bias" had recommended a less qualified white candidate over the black plaintiff were "sufficient to plead a cognizable claim under the Equal Protection Clause"); *cf. Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 608-10 (2d Cir. 2016) (affirming district court finding that zoning decision was based on impermissible animus in response to citizen complaints about the "flavor" and "character" of likely new residents).

Defendants contend that the Secretary was the decision-maker, not the President, and that the Secretary's decision did not involve classification of a group of foreign nationals on the basis of their individual characteristics, but rather the classification of a foreign state. As to the first of these contentions, there can be no doubt that if, as alleged, the President influenced the decision to terminate El Salvador's TPS, the discriminatory motivation cannot be laundered through the Secretary. *Staub v. Proctor Hospital*, 562 U.S. at 413. As to the second contention, it may prove to be true, but it is not what Plaintiffs allege. They allege that animus on the basis of race, color, and ethnicity was a motivating factor in the Secretary's decision to terminate El Salvador's TPS, *see* ECF No. 1 ¶¶ 81-83, and have offered sufficient evidence to make their Equal Protection claims plausible. *See also Ramos*, 321 F. Supp. 3d at 1131 (TPS plaintiffs plausibly stated claim that terminations were motivated by racial animus); *Centro Presente*, 2018 WL 3543535 at *14-15 (same).

### C. Due Process Clause

Plaintiffs allege that because the termination is motivated by discriminatory animus, it is a violation of the Fifth Amendment's guarantee of substantive due process as an "arbitrary" action. *See City of Sacramento v. Lewis*, 523 U.S. 833, 845 (1988). Defendants counter that the alleged conduct does not meet the "fatally arbitrary" standard of the Fourth Circuit. *See Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999).

Courts considering a claim for a substantive due process violation must first be "'reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended.'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1999) (Courts should thus "exercise the utmost care whenever we are asked to break new ground in this field." *Id.* (quoting *Glucksberg*, 521 U.S. at 720). In

cases challenging executive action, courts must ask, as a threshold question, whether the action is fatally arbitrary—that is, "whether the challenged conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id*. (quoting *Lewis*, 523 U.S. at 847 n. 8). When the conscience-shocking behavior is intentional, courts are more likely to find liability; conversely, when the conscience-shocking behavior is only negligent, courts are less likely to find liability. *Lewis*, 523 U.S. at 849. Only then should courts address the nature of the asserted liberty interest. *Hawkins*, 195 F.3d at 738.

Plaintiffs do not ask the Court to "break new ground" and recognize any new rights protected by substantive due process. Substantive due process has long encompassed racial discrimination, and it is no surprise; one can hardly think of a more arbitrary motivation for executive action than racial discrimination. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 12 (1967) (holding that laws barring interracial marriage were a violation of both the Equal Protection Clause and substantive due process); *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954) (outlawing racial segregation in District of Columbia public schools as a violation of substantive due process); *MARJAC, LLC v. Trenk*, 380 F. App'x 142, 147 (3d Cir. 2010) (holding that the plaintiffs properly alleged that a township's selective enforcement based on Italian heritage was a violation of substantive due process). Plaintiffs thus assert that the alleged conduct—alongside the severity of the consequences for the Salvadoran nationals—is sufficient to meet this "fatally arbitrary" threshold standard. The Court agrees. Plaintiffs allege that the President of the United States is intentionally willing to terminate TPS due to anti-Latino animus, sending 262,500 nationals of El Salvador back to a country that lacks the basic infrastructure to adequately handle their return. It is an action that, if true, would shock the conscience. Therefore, Plaintiffs have plausibly alleged a violation of substantive due process under the Fifth Amendment.

### D. Administrative Procedure Act

Under the APA, courts must set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A); "contrary to constitutional right, power, privilege or immunity," § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C); or "without observance of procedure required by law," § 706(2)(D). However, aggrieved persons are not entitled to judicial review of final agency action "to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." § 701(a). The parties do not dispute that the termination of TPS is final agency action.

To satisfy the arbitrary and capricious standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider." *Id.* "[A]n agency changing its course must supply a reasoned analysis." *State Farm*, 463 U.S. at 57 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)). The rational basis for an agency's decision must be supplied by the agency itself; the court may not infer the agency's reasoning from mere silence. *Id.*

Plaintiffs allege that the termination violates the APA in three ways. First, the decision was based on a discriminatory motive, making it arbitrary and capricious, contrary to constitutional right and power, and in excess of statutory authority. ECF No. 1 at ¶ 91-92. This

theory is coextensive with Plaintiffs' Equal Protection and Substantive Due Process theories, and survives for the same reasons.

Second, Plaintiffs allege the termination is arbitrary and capricious because DHS failed to conduct an objective assessment of the conditions in El Salvador. *Id*. at ¶ 93. In its opposition brief, they clarify the allegation that the Administration "abruptly and without explanation departed from [earlier] practice by considering only whether the conditions that led to the original 2001 TPS designation continue to be met and ignoring the other statutory criteria the INA provides for TPS designation." ECF No. 33 at 31. Defendants ask the Court not to consider this argument, because it was not well-developed in the Complaint. But the Complaint need not detail every single theory Plaintiffs may advance, as long as the factual allegations are "sufficient to support a meritorious legal claim." *Arar v. Ashcroft*, 585 F.3d 559, 594 (2d Cir. 2009). When viewing the Secretary's justification for the termination in the Federal Register against prior justifications, and the Secretary's lack of an explanation for a changed approach, Plaintiffs plausibly allege that the termination is arbitrary and capricious. *See Ramos*, 321 F. Supp. 3d at 1110-16 (holding that ongoing problems were considered in prior administrations' termination of TPS, but not here, and therefore plaintiffs had sufficiently alleged a new policy); *Centro Presente*, 2018 WL 3543535 at *16 (holding plaintiffs plausibly alleged violation of the APA where a new policy was made and the agency showed no good reasons for the new policy);

Third, Plaintiffs allege that the termination is arbitrary and capricious because DHS failed to consider the reliance interests of persons with protected status. This alleged reliance interest is rooted in the United States government's prior extensions of El Salvador's TPS while conditions in the country remained troubling. ECF No. 1 ¶ 94. Even if such interests could be established— and the explicitly temporary nature of the program suggests they could not—nothing in the TPS

statute requires the Secretary to consider any such interests in her determination. *See* § 1254a(b)(1). To accept this theory would require the Court to substitute its judgment for Congress' determination of the considerations the Secretary must take into account when designating or terminating a country for TPS. The Court declines to do so, and thus will not entertain this theory.

### E. The President as Defendant

Finally, Defendants contend the President is not a proper Defendant due to the separation of powers concerns that would arise from a court enjoining the President. "In general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin v. Mass.*, 505 U.S. 788, 802-03 (1993). Furthermore, any "grant of injunctive relief against the President himself is extraordinary, and should . . . raise [] judicial eyebrows." *Id*. at 802. There can be no doubt that Presidential action is reviewable, but it is ordinarily sufficient to seek to enjoin the officers who attempt to enforce the President's directive. *Id*. at 828; *see also Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("[i]n most cases . . . the injury at issue can be rectified by injunctive relief against subordinate officials). Defendants argue that an injunction issued against the Secretary would be sufficient relief for the claims in this case. To this, Plaintiffs only respond that it is premature to determine whether this case is one of the rare ones demanding the Court enjoin the President directly. *See Centro Presente*, 2018 WL 3543535 at *17 (denying motion to dismiss the President). Though ultimately, relief against the President himself is extraordinarily unlikely in this case, none of the authority cited by Defendants requires that the President be dismissed at this early stage. The Court thus denies Defendants' motion to dismiss President Trump from the case.

**IV.     CONCLUSION**

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss, ECF No. 28, with respect only to Plaintiffs' INA claim (Count III), and denies Defendants' motion in all other respects. A separate Order shall issue.

Date: <u>November  28, 2018</u>                                    <u>                /s                        </u>
                                                                                            GEORGE J. HAZEL
                                                                                            United States District Judge